**Robert J. SIMON, Appellant**

v.

**The STATE of Texas, Appellee.**

No. 14–04–00734–CR.

Court of Appeals of Texas, Houston (14th Dist.).

Sept. 28, 2006.

Troy W. McKinney, Houston, for appellants.

Peyton Peebles, III, Houston, for appellees.

Panel consists of Justices ANDERSON, EDELMAN, and FROST.

## OPINION

KEM THOMPSON FROST, Justice.

Challenging his conviction for driving while intoxicated ("DWI"), appellant Robert J. Simon asserts various evidentiary complaints, and also contends that the trial court reversibly erred by commenting on the weight of the evidence on several occasions during the guilt-innocence phase of his jury trial. Finding merit in the latter contention, we conclude that the trial court's improper comments on the weight of evidence were reasonably calculated, when considered from the jury's standpoint, to benefit the State. Accordingly, we reverse the trial court's judgment, and remand for a new trial.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Shortly after midnight, on August 12, 2003, appellant Robert J. Simon drove his vehicle across four lanes of traffic and cut off Officer Tony Tomeo and Officer Chad Nichols of the Houston Police Department, who were traveling in a marked patrol car on the same roadway. Officers Tomeo and Nichols immediately signaled appellant to stop and pull over. Appellant complied.

At trial, Officer Tomeo testified as follows:

- He was unsure whether he was distracted or talking to Officer Nichols just before appellant cut them off. He did not see appellant speed, weave, or fail to maintain a single lane prior to appellant cutting them off.
- Officer Tomeo smelled a strong odor of alcohol on appellant, which led him to believe that appellant had been drinking.[1]
- He asked appellant if he had been drinking that night, but could not remember appellant's response.[2]
- Officer Tomeo administered three standard field sobriety tests, and one non-standardized field sobriety test. The first test was the Horizontal Gaze Nystagumus ("HGN") test for which appellant displayed the maximum number (six) of clues of intoxication.[3]
- Appellant displayed all four possible clues on the one-leg-stand test, including swaying, dropping his foot, hopping, and using his arms to balance during the test.
- Appellant had difficulty performing the walk-and-turn test, but exhibited only three of the eight possible clues of intoxication for this test. Appellant was unable to touch heel to toe during his steps, but Officer Tomeo was unsure which ones. Appellant also stepped off the line.[4]
- A person needs to exhibit four clues on the walk-and-turn test before his performance counts as a failure. However, Officer Tomeo was not sure about the proper width of extension for the arms during this test, and he did not know whether appellant failed this portion. Officer Tomeo also did not know how far apart appellant's feet were when appellant failed to place his feet heel to toe.[5] Appellant did not have shoes on when he performed this test on the parking lot.
- Officer Tomeo also administered the non-standardized Rhomberg test in which he asked appellant to tilt his head back, close his eyes, and estimate thirty seconds. While performing the test, appellant swayed noticeably from side to side.[6] In addition, consistent with the effects of alcohol, appellant estimated that sixty-five seconds was thirty seconds.

Based upon their observations and appellant's poor performance on the field sobriety tests, Officers Tomeo and Nichols concluded that appellant had lost the nor-

1. Officer Nichols, a trainee of Officer Tomeo, testified that appellant had bloodshot eyes, slurred speech, and alcoholic breath. He also testified that appellant had a difficult time balancing without support.

2. At trial, Officer Nichols testified that at some point appellant admitted that he had been drinking Sambuca earlier that evening.

3. Officer Nichols also testified that appellant displayed all six clues on the HGN test. Officer Nichols, however, was not certified in this test and was not sure what clues he was "really looking for on the HGN" test.

4. In contrast, Officer Nichols testified that he observed appellant step off the line, use his arms for balance, and miss heel to toe on both the first and second steps of the nine steps.

5. Officer Nichols testified that although he was not certain, he believed that three clues (not four) were necessary to fail the walk-and-turn test. Officer Nichols acknowledged that he did not know what was required by the National Highway Traffic Safety Administration (NHTSA) in regard to this test.

6. Officer Nichols testified that he thought Officer Tomeo told appellant to remain still during the Rhomberg test, but later testified that he was unsure about the instructions given to appellant during this test.

mal use of his mental and physical faculties due to alcohol consumption, and arrested him for driving while intoxicated. Appellant was taken to the police department. While there, Sergeant Paul George administered more sobriety tests, in addition to testing appellant's breath with the Intoxilyzer 5000 infrared spectrometer instrument.

Sergeant George testified that the Intoxilyzer was working properly on the evening he tested appellant's breath. The samples, taken from appellant approximately one hour after Officer Tomeo stopped appellant from driving, showed .214 grams of alcohol per 210 liters of appellant's breath at 1:10 a.m., and .233 grams of alcohol per 210 liters of appellant's breath at 1:13 a.m. While at the station, appellant attempted and failed both the one-leg-stand test and the walk-and-turn test. These attempts were captured on videotape. Sergeant George testified that appellant failed the walk-and-turn test by demonstrating three of eight possible clues of intoxication, and that appellant demonstrated two of four possible clues of intoxication during his attempt at the one-leg-stand test. Sergeant George, observing appellant at the police station, noted appellant had the following symptoms of intoxication: (1) glassy eyes,[7] (2) slurred speech, (3) alcoholic breath, and (4) lack of balance without support. Sergeant George testified that appellant admitted that he had been drinking earlier that night. Based on his observations, Sergeant George concluded that appellant was intoxicated due to alcohol consumption.

## II. ISSUES PRESENTED

Appellant asserts the following points on appeal:

7. Sergeant George also stated that appellant's eyes could have been red because he had been crying.

(1) The trial court erred in overruling his objection to admission of the results of the HGN test because the proper screening questions were not asked.

(2) The trial court improperly commented on the evidence by stating that appellant's cross-examination of Officer Tomeo "did not matter" and by volunteering information to explain why police patrol cars did not have video cameras.

(3) The trial court improperly commented on the evidence by telling the jury that appellant's cross-examination of Ricky Viser of the Houston Police Department Crime Laboratory regarding the differences between the Intoxilyzer used in this case, and the newer "EN" model were irrelevant, and by stating that the reason the State did not have state-of-the-art technology was because of money.

(4) The trial court improperly commented on the evidence at trial by stating that appellant's cross-examination of the State's witness (Ricky Viser) was misleading and "outside of what it is" and by stating that the questions being asked by appellant's counsel were "not real cross-examination."

(5) The trial court erred in excluding the testimony of a witness offered to impeach the prior inconsistent statements of Officer Nichols and as substantive evidence.

(6) The trial court erred in excluding defense exhibit three, an offense re-

port, allegedly signed by both Officer Nichols and Officer Tomeo.[8]

## III. ANALYSIS

In support of issues two through four, appellant points to several places in the record where he contends that the trial judge improperly commented on the weight of the evidence. The first instance occurred during appellant's cross-examination of Officer Tomeo regarding the absence of audio recorders in police patrol cars. In his second issue, appellant cites to the following exchange:

Q: [Mr. Trichter]: If an audio recording would have been made, then this Jury could have heard the instructions that you gave Robert?

A: [Officer Tomeo]: (No response).

Q: [Mr. Trichter] Right?

[The State]: Objection. Argumentative.

[The Court]: *Mr. Trichter, I don't want to hear all of the things that could have been done out there. You can cross him on everything that he is trained to do. And, what he did. But, I don't want to go into all of "what else could have happened." Next, you will be talking about, "Why don't we have a video in every patrol car?" And, we all know that answer to that. A lot of lawyers ask—ask that question, and leave it hanging out there as if there had been negligence, or not, by not having video tapes in their cars. And, when there's really not money for it.*

[Mr. Trichter]: So, the Court is commenting on the evidence?

[The Court]: So, I don't want—I don't want to go into that whole area.

That's the kind of thing that you're leading into.

[Mr. Trichter]: Well, I object to this Court commenting on the—

[The Court]: We need to know what all happened out there at the scene and not what could have happened.

[Mr. Trichter]: I, again, object to the Court commenting. And, I move for a mistrial.

[The Court]: Denied. Let's proceed.

[Mr. Trichter]: Is the Court denying the Defendant the right to go ahead and put on this theory of the case?

[The Court]: Well, you may proceed under the—under the guideline that I just set forth.

[Mr. Trichter]: Well, my question is—is the Court denying the citizen accused the right to put on his theory of the—

[The Court]: Well, no, I don't want to hear talk like that. Let's just move on with whatever. But, away from all the things that he could have done, and without sending for more cars. It's a very narrow thing that I don't want you to do on cross.

[Mr. Trichter]: Well, cross-examination is not supposed to be narrow, your Honor.

[The Court]: I know that. Let's proceed.

Q:[Mr. Trichter]: It's suffice [sic] to say, Officer, that had a tape recording where's [sic] there an audio or a video been made, and preserved, we could have played it here for this Jury to see and hear?

A:[Officer Tomeo]: If one had been produced, it would have been here, yes, sir.

**8.** We address issues two, three, and four together because the analysis of all three issues is similar. And we address these issues first because our resolution of them is dispositive of the entire appeal.

Q:[Mr. Trichter]: And, you made a decision to not try and preserve a videotape or audio recording that night?

A:[Officer Tomeo]: (No response).

[The State]: Objection. Argumentative, Judge. There's no—

[The Court]: Sustained.

(Emphasis added).

In his third issue, appellant attacks the trial court's comments made during the testimony of the State's witness, Ricky Viser, a technical supervisor with the Houston Police Department Crime Laboratory. During direct examination, Viser testified that the Intoxilyzer 5000 used to test appellant's breath has been replaced by a newer version—the Intoxilyzer 5000 EN. Viser described the newer version as the same instrument as the one used to test appellant's breath, but enhanced with some additional features. Through cross-examination, appellant sought to explore the differences between the two instruments. It is this testimony that appellant proffers to support his third issue:

Q:[Mr. Trichter]: What are the differences, and if you know, between the "EN" and the # 5000?

A:[Mr. Viser]: The "68" and the "68 EN"?

Q:[Mr. Trichter]: Uh-huh?

A:[Mr. Viser]: Okay. Thank you. The difference is ... the "68 EN" is an enhanced instrument. It has five filter wheels on it versus the three. The "68." The instrument—

Q:[Mr. Trichter]: Well, if you will, Mr. Viser, stop right there. "Filter wheels." A filter wheel is kind of a safeguard on the device. It's to make sure that it reads alcohol and not something else?

A: [Mr. Viser]: That's correct.

Q:[Mr. Trichter]: So, they added forty percent more filter wheels, and with the "EN," didn't they?

A: [Mr. Viser]: They added two additional filters.

Q:[Mr. Trichter]: Forty percent more filters?

A: [Mr. Viser]: That's correct.

[The Court]: Well, Mr. Trichter, *why are you—are you pursuing the "state of the art"? I mean, we don't have the "state of the art."*

[Mr. Trichter]: Well, that's it, your Honor. That's it.

[The Court]: *I mean it could have been because of money or something like that, I guess.*

[Mr. Trichter]: Well, we're going to get to money, and in a little bit, too, Judge.

[The Court]: Well, I—

[Mr. Trichter]: And, because this was a "low bid" item.

[The Court]: *Well, we have what we have. And, I don't think it's relevant about what else is out there. So, I'm [sic] don't want to go too far into this.*

[Mr. Trichter]: Well, that's a comment on the evidence. And, the court is not supposed to do that. And, I object to the Court making a comment.

[The Court]: *Overruled.* So, any way, follow my instructions. And, not go there, again, unless it's—it's—

[Mr. Trichter]: Well, Judge, they're the ones that brought in "how good this machine was." And, that one being replaced, well, I wasn't going to go there, and until they brought it up. And, I have a right to comment on what they've made.

[The Court]: Well, you do. But, the fact ... I will remind you that ... well, the fact is that they might be better machines. *But, we don't have*

*those machines, and in this case. And, it might not be as good of a machine.* And, if so, you can pursue that. But, don't go into the fact that there are actually other machines out there.

[Mr. Trichter]: Well, the new machines show the deficiency of the old machines. And, that's why they're relevant, your Honor. This Jury has the right to know that the science behind breath testing has increased so much, and dramatically, that the machines that are presently used are outdated. And, not worth the money that we pay for them.

[The Court]: Well, just follow my instructions, Mr. Trichter, please. *Overruled.*

[Mr. Trichter]: Well, it goes to his credibility, too. And, his credentials. Because he has to know what the other machines are in the field. So that, he knows what other advances, if any, are being made. How can he do quality assurance, and if he doesn't know about what else is happening? He can't live in a closet.

[The Court]: Well, this man is not the proper man to answer those kinds of questions.

[Mr. Trichter]: Well, he is, your Honor.

[The Court]: *Well, he doesn't have the authority to do anything about it. So, I don't want to have any more discussion about this. So, let's continue. But, do what I said.*

[Mr. Trichter]: Well, what was your order, your Honor?

[The Court]: My order was to not proceed with questioning the . . . witness, and with newer things about it. And, you can have your exception. And, you can put it in the record. And, right now. Just say that you want to say. [sic].

[Mr. Trichter]: Well, I want to ask this witness questions about the Intoxilyzer # 8000. And, I want to talk to him about the differences between the # 8000. Which is the state of the art. And, how it measures temperature. And, how it measures volume. And, that these devices that we have—the "68 Series"—doesn't do that. And, the reason the manufacturer did that is because—

. . .

[The Court]: Well, I knew that, yes. Yes. And, Mr. Trichter, do you need to put something else, and on the record here?

[Mr. Trichter]: Well, your Honor, you just told me to do what I do.

[The Court]: And, then, it stopped. Right?

[Mr. Trichter]: Yeah.

[The Court]: And, you're *overruled.* So, then, let's move on.

(Emphasis added).

In issue four, appellant attacks the following comments by the trial court:

Q:[Mr. Trichter]: Now, if we go to the memory of your computer, there will be a file that has "invalid tests" that came from this—that came from this device?

A:[Mr. Viser]: Yes, sir.

Q:[Mr. Trichter]: And, there are more than two "invalid tests" in your files, and since it's been in use?

A: [Mr. Viser]: (No response).

Q:[Mr. Trichter]: Right?

A:[Mr. Viser]: (No response).

[The State]: Objection. Relevance.

[The Court]: Overruled.

A:[Mr. Viser]: That's correct.

Q:[Mr. Trichter]: And, they [sic] are more—there are more than a hundred

"invalid tests" in that file, and since it has been in use. Correct?

A:[Mr. Viser]: That's correct. That shows that the instrument is working.

Q:[Mr. Trichter]: Well, give me just a "yes" or a "no," sir?

A:[Mr. Viser]: I said, "Yes."

Q:[Mr. Trichter]: And, there are more than a thousand "invalid tests" in that file, sir?

A:[Mr. Viser]: (No response).

[The Court]: Well, Mr. Trichter, you need to allow him to give a full answer to that.

[Mr. Trichter]: Well, your Honor there is a difference between direct examination and cross-examination. The Court is not permitted to let him tell his story. The Court is supposed to have him answer the question. And, that's what the adversary system is for. And, if they have questions, they can ask him. But, you cannot let him deny the right for us to tell our side of the facts.

[The Court]: Well, Mr. Trichter, it's about time that we have cross-examination. And, it may be too late. And, when you ask a questions [sic] like—like—like you're saying—all of these "invalid tests"—you're leading outside of what it is. Is it so necessary, Mr. Trichter, for the Jury to have the—the—

[Mr. Trichter]: Well, the Court is commenting on the evidence, again, your Honor. And, I ... must say that I object to it. If you are taking the wrong—

[The Court]: Well, I will handle these, now. I'm going to let him give a full answer. A full answer.

[Mr. Trichter]: Well, I'll just sit down, then, your Honor, because you are denying the Defendant the right to cross-examination. You're denying the right to confront. You're making me ineffective as his lawyer. And, until you take control of this witness, we cannot get a fair trial in here.

[The Court]: Well, I'm taking control of this trial, Mr. Trichter.

[Mr. Trichter]: Well, if you have not, you're denying us a fair trial.

[The Court]: I am in control of this trial. (Pause). So, now, answer the question, and with a full answer.

[Mr. Viser]: The ... there have been a lot of invalid tests. But, that's a misconception, Judge. That's showing that the instrument is working properly. When it invalidate [sic] a test, it's showing that the—that the subject—well, like a "RFI." If it was—if it was a radio frequency interference, it would invalidate the test. And it's doing just what it was designed to do. And, a lot—a lot of times, people take that as a misconception, and like it's not working. But, Judge, it's really doing exactly what it's supposed to. And, it is working.

[The Court]: All right. Mr. Trichter, go ahead.

[Mr. Trichter]: Well, your Honor, I don't know. Because every time I ask a question, you allow him to undercut the Defense's case. So, with me continuing to ask questions, you are, and in effect, allowing—helping him—helping the State—undermine the Defense.

[The Court]: Well, Mr. Bailiff, take the Jury out.

(Jury Removed)

▆▆▆ The trial judge shall maintain an attitude of impartiality throughout the trial. *Lagrone v. State*, 84 Tex.Crim. 609, 209 S.W. 411, 415 (1919). To the jury, the language and conduct of the trial court

have a special and peculiar weight. *See Livingston v. State,* 782 S.W.2d 12, 14 (Tex.App.-Dallas 1989, pet. ref'd). Article 38.05 of the Texas Code of Criminal Procedure provides:

**Judge shall not discuss evidence**

 In ruling upon the admissibility of evidence, the judge shall not discuss or comment upon the weight of the same or its bearing in the case, but shall simply decide whether or not it is admissible; nor shall he, at any stage of the proceeding previous to the return of the verdict, make any remark calculated to convey to the jury his opinion of the case.

TEX.CODE CRIM. PROC. ANN. art. 38.05 (Vernon Supp.2005). A trial court must refrain from making any remark calculated to convey to the jury its opinion of the case. *Brown v. State,* 122 S.W.3d 794, 798 (Tex. Crim.App.2003). In *Brown,* the Court of Criminal Appeals explained the rationale for this rule, stating:

[J]urors are prone to seize with alacrity upon any conduct or language of the trial judge which they may interpret as shedding light upon his view of the weight of the evidence, or the merits of the issues involved.

122 S.W.3d at 798. The trial court improperly comments on the weight of the evidence if it makes a statement that implies approval of the State's argument, indicates disbelief in the defense's position, or diminishes the credibility of the defense's approach to the case. *Clark v. State,* 878 S.W.2d 224, 226 (Tex.App.-Dallas 1994, no pet.). Applying this standard, we first examine whether the challenged remarks, made by the trial judge during appellant's jury trial, were improper comments on the weight of the evidence.

Jurors tend to take hold of a trial judge's remarks, which they often "inter-

pret as shedding light upon his view of the weight of the evidence, or the merits of the issues involved." *Bachus v. State,* 803 S.W.2d 402, 405 (Tex.App.-Dallas 1991, pet. ref'd). The *Bachus* court observed, "it defies logic and common sense to expect a jury to tell its 'own judge' that he is wrong." *Bachus,* 803 S.W.2d at 405. The law commands that a judge presiding over a trial shall govern the trial and his own conduct in such a manner that his opinion of the merits of the case or the credibility of the witnesses shall not be made known to the jury. *See Blumenthal v. State,* 98 Tex.Crim. 601, 267 S.W. 727, 731 (1925) (stating that "[t]ransgressions of this rule, when calculated to prejudice the case of the accused, have frequently been held to demand a reversal of the judgment").

 In ruling upon the admissibility of evidence, the trial court should abstain from anything beyond a simple announcement of the ruling. *Wilson v. State,* 17 Tex.App. 525, 1885 WL6745, at *8 (Tex.Ct. App.1885). This approach is crucial if the trial judge is to be viewed as dispensing justice without fear, favor, or affection. It is presumed that a judge can and will divest himself of any previous conceptions and that he will base his rulings on the facts developed at trial. The fairness of a trial might be seriously questioned if the jury's perception of the trial judge is clouded with a suspicion that he is becoming an advocate for one side or that he is attempting to influence their judgment based on his unfavorable belief as to the credibility of a party or position. Thus, a trial judge should not express an opinion on the weight of the evidence or imply in any manner that he believes or disbelieves the testimony of any witness.

 Within the record excerpts quoted verbatim above, we examine the propriety

of the following comments as to which appellant preserved error: [9]

> [The Court]: Mr. Trichter, I don't want to hear all of the things that could have been done out there. You can cross him on everything that he is trained to do. And, what he did. But, I don't want to go into all of "what else could have happened." Next, you will be talking about, "Why don't we have a video in every patrol car?" And, we all know that answer to that. A lot of lawyers ask—ask that question, and leave it hanging out there as if there had been negligence, or not, by not having video tapes in their cars. And, when there's really not money for it. **(Issue two).**

> [The Court]: Well, we have what we have. And, I don't think it's relevant about what else is out there. So, I'm [sic] don't want to go too far into this. **(Issue three).**

> [The Court]: Well, you do. But, the fact ... I will remind you that ... well, the fact is that they might be better machines. But, we don't have those machines, and in this case.

> And, it might not be as good of a machine. And, if so, you can pursue that. But, don't go into the fact that there are actually other machines out there. **(Issue three).**

> [The Court]: Well, Mr. Trichter, it's about time that we have cross-examination. And, it may be too late. And, when you ask a questions [sic] like— like—like you're saying—all of these "invalid tests"—you're leading outside of what it is. Is it so necessary, Mr. Trichter, for the Jury to have the— the—**(Issue four).**

In viewing these comments in the context in which they were made, and in light of the entire record, we conclude the trial court strayed beyond the boundaries of permissible remarks: (1) by introducing factual matters not in evidence and (2) by expressing the trial court's opinions regarding the parties' positions.

The trial court's role is to rule on the admissibility of the evidence, not to present evidence or share the court's views of the case with the jury. Though there is nothing in the record to suggest that the

---

9. In regard to the comments in issue three, the State contends that appellant failed to timely object and preserve error regarding the following comments:

> (1) "Why are you—are you pursing the 'state of the art?'" I mean, we don't have the "state of the art.";
> (2) "it could have been because of money, or something like that, I guess."; and
> (3) "he doesn't have the authority to do anything about it."

As a general rule, trial counsel must object to preserve error, even if it is "incurable" or "constitutional." See Cockrell v. State, 933 S.W.2d 73, 89 (Tex.Crim.App.1996). However, the Texas Court of Criminal Appeals, in a plurality opinion, stated that a trial judge's comments "which tainted [the defendant's] presumption of innocence in front of the venire, were fundamental error of constitutional dimension and required no objection." See Blue v. State, 41 S.W.3d 129, 132 (Tex.Crim.

App.2000) (stating in a plurality opinion that a defendant need not object to comments from a trial court in order to preserve error where such comments are held to constitute fundamental error); see also Jasper v. State, 61 S.W.3d 413, 421 (Tex.Cim.App.2001) (concluding that "the court may take notice of fundamental errors affecting substantial rights although they were not presented to the court"); Murchison v. State, 93 S.W.3d 239, 261–62 (Tex.App.-Houston [14th Dist.] 2002, pet. ref'd) (same); Hoang v. State, 997 S.W.2d 678, 680–81 (Tex.App.-Texarkana 1999, no pet.) (addressing whether the trial court's comments were improper even though appellant failed to object to the comments). We do not consider the comments made by the trial court in this case to be fundamental error; therefore, an objection was required to preserve error. However, we conclude that appellant preserved error as to the comments listed on pages 15 and 16 of this opinion.

trial judge acted with improper motives in presiding over the trial in this case, we nonetheless conclude that his comments indicated a disbelief in appellant's position, and implied approval and support of the State's position. *See McClory v. State*, 510 S.W.2d 932, 934 (Tex.Crim.App.1974); *Ward v. State*, 156 Tex.Crim. 472, 243 S.W.2d 695, 696–97 (1951). For instance, the trial court's comment in regard to the relevancy of the differences between the Intoxilyzer used to test appellant's breath and the newer model indicated the court's unfavorable view of appellant's position. If the trial court believed that the evidence was irrelevant and inadmissible, it should have ruled as such and left it at that. *See Thompson v. State*, 90 Tex.Crim. 125, 234 S.W. 406, 408–09 (1921) (finding objectionable a remark of the court, in excluding evidence that prosecuting witness was operating a gambling resort where the crime occurred, "that it was a very good argument for a preacher to make, but does not sound like a lawyer"); *Betts v. State*, 65 Tex.Crim. 358, 144 S.W. 677, 679 (1912) (concluding that it was improper for the court to state, in ruling on the admissibility of testimony, "that a person could tell a thing as well by hearing a thing as seeing it"); *Tejeda v. State*, 905 S.W.2d 313, 317 (Tex.App.-San Antonio 1995, writ ref'd) (stating that the trial court's role is as a neutral referee not an advocate); *Pitt v. Bradford Farms*, 843 S.W.2d 705, 708–09 (Tex.App.-Corpus Christi 1992, no writ) (concluding that the trial judge acted improperly by examining the witness in front of the jury); *Johnson v. State*, No. 05–92–01060–CR, 1993 WL 332444, at *3 (Tex. App.-Dallas Aug.26, 1993, writ ref'd) (not designated for publication) (finding improper the trial court's continued exchange with appellant, its "instructions" on questions of law and fact, and its announcement of the pretrial ruling on admissibility of appellant's statement). Instead, the trial court suggested its own reasons for the State not having used the newer model, reasons that had no evidentiary support in the record. In addition, by his comments, the trial judge signaled to the jury his own rejection of the points the defense was trying to make. Without judging the trial court's intention in making these comments, we conclude they were improper.

■ We now must address whether these comments are material. *See Burge v. State*, 443 S.W.2d 720, 724 (Tex.Crim. App.1969). A matter is material if the jury had the same issue before it. *See Jackson v. State*, 548 S.W.2d 685, 695 (Tex. Crim.App.1977). In this DWI case, whether appellant was intoxicated was a material issue for the jury—and a notably disputed one. The trial court's comments (challenged in issue three) regarding the differences between the Intoxilyzer used on appellant and the newer model, as well as the purported reasons the police department did not have the newer model were directly related to this material issue. In addition, the trial court's comments (challenged in issue two) as to why the police do not have portable video players in their patrol cars also was related to the issues the jury had to decide. However, the trial court's comment (challenged in issue four) that it was "about time that we have cross-examination" and that "it may be too late" were not material.

Having determined that the trial court's comments in issues two and three were material, we now must determine whether the error is reversible. To constitute reversible error in violation of Article 38.05, an improper comment on the weight of the evidence must be such that it is either reasonably calculated to benefit the State or to prejudice the defendant's right to a fair and impartial trial. *Brokenberry v. State*, 853 S.W.2d 145, 153 (Tex.App.-Houston [14th Dist.] 1995, pet. denied).

██ Non-constitutional error that does not affect substantial rights is subject to a harm analysis under Texas Rule of Appellate Procedure 44.2(b). *See Johnson v. State*, 967 S.W.2d 410, 417 (Tex.Crim.App. 1998); *Matz v. State*, 21 S.W.3d 911, 912 (Tex.App.-Fort Worth 2000, pet. ref'd). Whether the trial court's material and improper comments constitute reversible error is governed by a non-constitutional error standard. *See Jasper*, 61 S.W.3d at 421 (concluding that unless the trial court's comments are fundamental errors of constitutional dimension (tainting the defendant's presumption of innocence), an objection to such comments is necessary to preserve error); *Tennison v. State*, 814 S.W.2d 484, 486 (Tex.App.-Waco 1991, no pet.) (concluding that a mere violation of Article 38.05 does not necessarily constitute reversible error, and if the error made no contribution to the conviction of the defendant, then the error will be deemed harmless); *Akudigwe v. State*, No. 14–00–00372–CR, 2002 WL 28156, at *2–3 (Tex.App.-Houston [14 Dist.] Jan. 10, 2002, no pet.) (not designated for publication) (citing to the harmless error standard in evaluating whether the trial court's comments constituted reversible error).

██ A substantial right is affected when the error had a substantial and injurious effect or influence in determining the jury's verdict. *King v. State*, 953 S.W.2d 266, 271 (Tex.Crim.App.1997). Substantial rights are not affected by the erroneous admission of evidence "if the appellate court, after examining the record as a whole, has fair assurance that the error did not influence the jury, or had but a slight effect." *Motilla v. State*, 78 S.W.3d 352, 355 (Tex.Crim.App.2002). Neither the appellant nor the State has any formal burden to show harm or harmlessness under Rule 44.2(b). *See Burnett v. State*, 88 S.W.3d 633, 638 (Tex.Crim.App.2002).

Rather, it is the appellate court's duty to assess harm after a proper review of the record. *Id.*

██ In conducting the harm analysis, we consider everything in the record, including any testimony or physical evidence admitted for the jury's consideration, the trial court's instructions to the jury, the State's theory, any defensive theories, closing arguments, and even voir dire if material to the appellant's claim. *Motilla*, 78 S.W.3d at 355–56; *Morales v. State*, 32 S.W.3d 862, 867 (Tex.Crim.App. 2000). In assessing harm, the factors to be considered are the nature of the evidence supporting the verdict, the character of the alleged error, and how the evidence might be considered in connection with the other evidence in the case. *Motilla*, 78 S.W.3d at 355; *Morales*, 32 S.W.3d at 867. Whether the error was compounded or emphasized also can be a factor. *See e.g., Motilla*, 78 S.W.3d at 356. We ask if a reasonable probability exists that the error moved the jury from a state of nonpersuasion to one of persuasion beyond a reasonable doubt. *Wesbrook*, 29 S.W.3d 103, 119 (Tex.Crim.App.2000). The existence of substantial evidence of the defendant's guilt may be the most significant factor in a harm analysis. *Id.* at 359.

██ One of the most fundamental components of a fair trial is "a neutral and detached judge." *Metzger v. Sebek*, 892 S.W.2d 20, 37–38(Tex.App.-Houston [14th Dist.] 1994, writ denied). A judge should be fair and impartial and not act as an advocate for any party. *Delaporte v. Preston Square, Inc.*, 680 S.W.2d 561, 563 (Tex. App.-Dallas 1984, writ ref'd n.r.e.). The trial court should refrain from verbally confronting or displaying displeasure toward counsel, particularly in the presence of the jury. *Metzger*, 892 S.W.2d at 38. Even in federal court, where a judge has the authority to comment on the evidence,

the judge may not assume the role of a witness. *See U.S. v. Blevins*, 555 F.2d 1236, 1240–41(5th Cir.1977) (stating that the trial judge has the right to analyze and comment on the evidence provided that it is made clear to the jury that the comments merely express view of the court which are not binding on the jury and that the jury is free to determine the facts according to their own judgment); *U.S. v. Cisneros*, 491 F.2d 1068, 1073–74 (5th Cir. 1974) (holding that trial court committed reversible error when its comments added evidence about a defense witness's demeanor, and affirming the principle that "[i]n commenting on the evidence, trial judge may not give testimony, be a partisan witness or add to the evidence adduced by either side and he must in no way trespass on the jury's functions and responsibilities, among the most important of which is the right to assess credibility in finding the facts").

Part of the trial court's responsibility is to admonish counsel that in addressing the jury they are required to stay within the record so that the jury will not base its decision on any evidence not adduced at trial. *See McGee v. State*, 689 S.W.2d 915, 925 (Tex.App.-Houston [14th Dist.] 1985, pet. ref'd) (concluding that an "error is compounded by alleging that the facts not in evidence are true"). Thus, for reasons too obvious to state, the trial court also must stay within the record in making remarks to the jury. Indeed, because of the presiding role that the trial judge serves during a trial, it is imperative that he be even more careful to avoid making statements that are improper. *Strong v. State*, 138 S.W.3d 546, 552 (Tex.App.-Corpus Christi 2004, no pet.) (stating that although a judge can lawfully provide guidance and manage the presentation of evidence from the bench, he must not abandon his role as an independent arbiter).

Though nothing suggests the trial court intended any adverse consequences, his comments alerted the jury to the trial court's opinion on a material fact issue raised by the evidence—whether appellant was intoxicated while driving. In his response to appellant's counsel's questions regarding audio recorders in patrol cars, and the differences between the Intoxilyzer used for appellant's breath test, and the "newer" model, the trial judge injected new "facts" into the record, and in the process diminished the credibility of the defense's approach to the case. When a trial judge takes on the role of an advocate for the State, introducing new "facts" that were not in evidence, his actions and conduct that inure to the State's benefit not only impact the state of the evidence but also impact the dynamics of the trial. *See Clark v. State*, 878 S.W.2d 224, 226 (Tex. App.-Dallas 1994, no pet.) (finding that the trial court's comments regarding [appellant's] prior convictions were reversible error). The trial judge's ongoing exchanges with appellant's counsel, and his comments on how he assessed the defensive points appellant was attempting to make bespoke a distinct negativity toward appellant's position that almost certainly did not escape the jury's notice. *See Preston v. State*, 147 Tex.Crim. 25, 177 S.W.2d 968, 969 (1944) (concluding that court's comment on the weight of the evidence of nine-year-old girl for whose aggravated assault accused was being prosecuted was error); *Davis v. State*, 114 Tex.Crim. 72, 24 S.W.2d 417, 418 (1929) (finding reversible a trial court's comment in response to a relevancy objection made by the state because such comment implied the trial court's belief that the conduct of the witness evidenced the fact that he was a disinterested witness). Moreover, the comments of which appellant complains were not isolated or neutral comments.

■ In assessing the impact of a trial court's improper comments, a reviewing court is concerned with whether the jury would be unfairly influenced by additional comments from the bench. *Strong*, 138 S.W.3d at 553 (finding that because comments were made outside the presence of the jury, this concern was moot). In this case, in viewing the record as a whole, the jury could have been influenced toward the State's position based on the trial judge's comments regarding the Intoxilyzer used to test appellant's breath and the newer version, as well as by the judge's comments regarding audio or video recorders in patrol cars.

■ The evidence regarding appellant's guilt is not overwhelming and the testimony given by the officers who arrested appellant at the scene was inconsistent in places. Officer Nichols and Officer Tomeo contradicted both each other and themselves on the appropriate steps and procedures for all of the field sobriety tests conducted at the scene. In addition, the Intoxilyzer results (read by the technical supervisor, Ricky Viser) showed .214 grams of alcohol per 210 liters of appellant's breath at 1:10 a.m., and .233 grams of alcohol per 210 liters of appellant's breath at 1:13 a.m. However, Viser, during cross-examination, stated that in order for the results of the breath test to be accurate, appellant would have had to have consumed almost seventy drinks of Sambuca, and a person at this level would be "commode hugging drunk." This assessment is inconsistent with the descriptions of appellant's behavior at the time he was actually stopped by Officers Tomeo and Nichols (which was an hour earlier). Neither Officer Tomeo nor Officer Nichols described appellant as manifesting this high level of intoxication. Some of the trial judge's improper comments related directly to the reliability of the Intoxilyzer used to test appellant's breath. Though the trial court may have intended no ill result, the absence of improper motive does not diminish the damaging nature of the remarks. Viewed objectively, the trial court's comments were reasonably calculated to benefit the State and prejudice appellant's rights. *See Valles v. State*, 817 S.W.2d 138, 141 (Tex.App.-El Paso 1991, no pet.) (concluding that the trial court's comment, in response to defendant's objection was calculated to convey to the jury its opinion of the case).

For this reason, we cannot say with fair assurance that the trial court's comments did not influence the jury's decision or had only a slight effect. *See* TEX.R.APP. P. 44.2(b); *Kincade v. State*, 552 S.W.2d 832, 835–36 (Tex.Crim.App.1977) (concluding that the trial court's comments were improper and reasonably calculated to benefit the state); *McDonald v. State*, 149 Tex. Crim. 211, 193 S.W.2d 216, 217 (1946) (finding reversible that when the trial court overruled an objection to the introduction of certain testimony and also provided an explanation that it was admitted for a certain purpose and with a certain effect); *McPherson v. State*, 79 Tex.Crim. 93, 182 S.W. 1114, 1116 (1916) (concluding that the court's remark that "[a]ll this cross-examination of the testimony of this witness could have been eliminated upon objection by the state because the testimony is immaterial" was reversible error). The trial court's improper comments, considered as a whole, require reversal and warrant a new trial. Accordingly, we sustain appellant's issues two and three as related to the comments specifically addressed above. We reverse the trial court's judgment and remand this case for a new trial consistent with this opinion.