

# NUMBER 13-17-00197-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

**PAUL LEE NAVARRO,**                                                                 **Appellant,**

**v.**

**THE STATE OF TEXAS,**                                                                 **Appellee.**

## On appeal from the 357th District Court
## of Cameron County, Texas.

# MEMORANDUM OPINION

**Before Chief Justice Valdez and Justices Rodriguez and Benavides
Memorandum Opinion by Chief Justice Valdez**

Appellant Paul Lee Navarro appeals his convictions of theft of a firearm, a state jail felony, TEX. PENAL CODE ANN. § 31.03 (West, Westlaw through 2017 1st C.S.), burglary of a habitation, a second-degree felony, *id.* § 30.02 (West, Westlaw through 2017 1st C.S.), and unlawful possession of a firearm by a felon, a third-degree felony. *Id.* § 46.04

(West, Westlaw through 2017 1st C.S.). The trial court sentenced appellant to concurrent sentences of two years' confinement for the theft of a firearm charge and ten years' confinement for each of the other two convictions. By six issues, appellant contends that the evidence is insufficient to support each of his three convictions, the trial court improperly commented on the weight of the evidence during his closing argument and in the jury charge, and there is cumulative error.[1] We affirm.

## I.     SUFFICIENCY OF THE EVIDENCE

By his first, second, and third issues, appellant contends that the evidence is insufficient to support his convictions of burglary of a habitation, unlawful possession of a firearm by a felon, and theft of a firearm.

## A.     Standard of Review

To determine whether the evidence is sufficient, we consider all the evidence in the light most favorable to the verdict and determine whether a rational fact finder could have found the essential elements of the crime beyond a reasonable doubt based on the evidence and reasonable inferences from that evidence. *Whatley v. State*, 445 S.W.3d 159, 166 (Tex. Crim. App. 2014); *Brooks v. State*, 323 S.W.3d 893, 898–99 (Tex. Crim. App. 2010). The fact finder is the exclusive judge of the facts, the credibility of witnesses, and the weight to be given their testimony. *Brooks*, 323 S.W.3d at 899. We resolve any evidentiary inconsistencies in favor of the judgment. *Id.*

In our sufficiency review, "direct evidence of the elements of the offense is not required." *Hooper v. State*, 214 S.W.3d 9, 15 (Tex. Crim. App. 2007). It is not dispositive of the issue of the defendant's guilt if direct evidence is lacking. *Guevara v. State*, 152

---

[1] We have renumbered appellant's issues and will address them as renumbered.

S.W.3d 45, 49 (Tex. Crim. App. 2004). Circumstantial evidence is as probative as direct evidence, and juries are permitted to make reasonable inferences from the evidence presented at trial and in establishing the defendant's guilt. *Hooper*, 214 S.W.3d at 15. The defendant's guilt may be established sufficiently by circumstantial evidence alone. *Guevara*, 152 S.W.3d at 49. "Each fact need not point directly and independently to the guilt of the appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Thomas v. State*, 444 S.W.3d 4, 8 (Tex. Crim. App. 2014); *Winfrey v. State*, 393 S.W.3d 763, 768 (Tex. Crim. App. 2013).

One of the strongest kinds of evidence of guilt is a "consciousness of guilt." *Torres v. State*, 794 S.W.2d 596, 598 (Tex. App. 1990) (citing and quoting Ray, Texas Practice Vol. 2, *Law of Evidence*, § 1538, at 242 (1980)). Thus, "any conduct on the part of a person accused of a crime subsequent to its commission, which indicates a 'consciousness of guilt' may be received as a circumstance tending to prove that he committed the act with which he is charged." *Id.* Providing false statements is indicative of a consciousness of guilt and an attempt to cover up a crime. *See King v. State*, 29 S.W.3d 556, 565 (Tex. Crim. App. 2000) (considering the appellant's untruthful letters to the media concerning the events occurring during the evening of the crime in its sufficiency analysis); *Couchman v. State*, 3 S.W.3d 155, 163–64 (Tex. Crim. App. 1999) (stating that the fact that the appellant initially changed his story is evidence of his consciousness of guilt and that the jury could have reasonably concluded that the appellant lied because he had something to hide); *see also Richmond v. State*, No. 13-10-00349-CR, 2012 WL 3265088, at *6 (Tex. App.—Corpus Christi Aug. 9, 2012, pet. ref'd) (mem. op., not designated for publication) (concluding that the "fact-finder could

infer from appellant's changing story that he was trying to cover up that [a witness] had seen him hauling items that he had stolen from Bruns's property").

## B. The Evidence

### 1. Nelson Snavely's Testimony

At appellant's trial, Nelson Snavely, testified that on February 12, 2016, a burglary occurred at his residence in Harlingen, Texas while he was on vacation in Las Vegas, Nevada. According to Snavely, on the day of the burglary, Snavely's mother, who was at his home with his children, took the children to school, and she did not return to the home all day. Snavely stated that, while he was in Vegas, his mom, who was hysterical, called to tell him that someone had "broken into . . . the house." Snavely and his wife were unable to return home that day, and they had to return on the originally planned departure date. Snavely testified that when he arrived, the house "was a disaster" with drawers left open and items taken out and thrown around. Snavely clarified that the mess occurred mainly in the master bedroom which contained a vault. Snavely, a gun collector, explained that the vault containing several weapons had been stolen. Snavely clarified that there were twenty-two weapons, a lot of ammunition, and "a lot of different items in [it] that were valuable to [him]." Snavely described the vault as "a 700-pound safe" that was "six feet tall, four feet wide, four feet deep, so a very big safe." Snavely stated that other items stolen included televisions, jewelry, his wife's purses, credit cards, "and things like that." Snavely testified that he had also hidden $30,000 within the walls of the safe.

Snavely, appellant's boss, stated that he invited appellant into his home and that appellant had a question about his security system. Snavely testified that he informed appellant that the security system was not working, and the conversation ended. Snavely

stated that although appellant had never been in his bedroom, appellant had seen Snavely's safe when Snavely sent appellant "a Snapchat, which is a social media thing." Snavely further explained that although appellant had not actually seen his gun collection, appellant was aware of it and appellant was aware that Snavely was going to Las Vegas.

Snavely also testified that he saw his guns once more after the burglary when the police showed him a video of his guns. Snavely elaborated, "There was a video of the gentleman showing—or a video recording every single weapon and saying things in the background about the weapons." According to Snavely, the voice on the video was not appellant's voice.

Snavely stated that he had recovered a nine-millimeter gun after the burglary, which the Harlingen Police Department located at a residence where codefendant Pasqual Fernandez (Pasqual) was found.

Snavely testified that he suspected that appellant was responsible for the burglary, and he attempted to get information regarding the burglary by asking appellant if he had committed the offense. According to Snavely, appellant denied any involvement in the crime. Snavely stated that in the past appellant had asked him for loans for $8,000 and $7,000. Snavely said that eventually he loaned appellant $800, which appellant paid back. According to Snavely, "a little less than a month" prior to the burglary, appellant was involved in an automobile accident, his car was impounded, and he asked Snavely for another loan. Snavely stated that he refused to give appellant the loan.

During cross-examination, Snavely testified that his mother, wife, and children knew about the safe in his bedroom. Snavely agreed that during his Las Vegas trip, he sent private messages on Snapchat to his mother, his sister, Blanca Moreno, Francis

5

Moreno, his employee Guadalupe Elizondo, and appellant. Snavely denied that he sent other friends messages. Appellant's trial counsel asked, "So there's potentially three or four people other than yourself that know you're in Vegas, and three or four other people that potentially know you have a safe in your closet, correct?" Snavely said, "Correct."

On redirect examination by the State, Snavely denied ever posting messages on social media that he was going to Las Vegas or that he was away from his home. Snavely clarified that only his mother, his office staff, and Guadalupe Elizondo knew of his trip. After the burglary, Snavely fired appellant and Elizondo.

2.     Manuel Trevino's Testimony

The chief of police for the city of Primera, Texas, Manuel Trevino, testified that he was familiar with this case and that a tipster made a call to a Crime Stoppers Officer about a video showing some weapons that were allegedly taken during a burglary. According to Chief Trevino, the Crime Stopper caller indicated that he had received the video from Pasqual so that the Crime Stopper caller could find a buyer for the weapons. Chief Trevino testified that the Harlingen Police Department conducted a search of Pasqual's residence and they located one of Snavely's guns, which had been entered into "the National Crime Stolen Property data base." Chief Trevino stated that after showing Pasqual the video, he proceeded to a storage facility in Harlingen where appellant and a codefendant Juan Jaquez rented a storage unit. Chief Trevino acquired the surveillance video and entrance code records to the storage facility. The earliest date of the surveillance video is February 12, the same day that the burglary occurred.

The State published the surveillance video to the jury with Chief Trevino describing what had occurred in the video. Chief Trevino stated that the video first showed two vans

6

entering the storage facility, one van driven by Jaquez and the other van driven by appellant. According to Chief Trevino, the video shows appellant and Jaquez enter the storage facility's office and make the contract to rent the storage unit. Chief Trevino testified that there was not a video camera pointed in the direction of the storage unit rented by appellant, that key pad records show that appellant entered the storage facility approximately eleven times, and that when the police officers searched the unit approximately one month after the burglary there was nothing but some old tire rims in it. Chief Trevino testified that the video of the guns was filmed "[i]nside the storage unit."

On cross-examination, Chief Trevino clarified that he knew that the video of the guns sent to the police by the Crime Stopper caller had been made in the storage unit rented by appellant because Pasqual told him so. When appellant's trial counsel asked if Pasqual told Chief Trevino that he made the video, Chief Trevino responded that Pasqual said that he and appellant made the video together.

3.      Joe Aldape's Testimony

Joe Aldape, a sergeant with the Primera Police Department, testified that he interviewed appellant. Appellant denied involvement in the burglary and told Sergeant Aldape that "he was asleep all day" on February 12 and that he had to pick up his daughter at school at approximately three o'clock p.m. Sergeant Aldape stated that appellant said his wife had already picked up his child from school, so appellant stayed home. When asked by the State based on the surveillance video of the storage unit, "Is what [appellant] said correct," Sergeant Aldape replied, "No, it is not correct." Sergeant Aldape explained that the videos from the storage facility showed appellant entering the premises at the time appellant stated he was home. Sergeant Aldape continued that about one hour later,

7

appellant returned to the storage facility and signed the contract to rent a storage unit. When asked by the State if appellant "ever correct[ed] that fact," Sergeant Aldape said, "No, he didn't." Sergeant Aldape testified that he observed on the video that appellant entered the storage facility "approximately, maybe seven to eight times. . . ." Sergeant Aldape stated that on one occasion appellant entered the storage facility in a Chrysler 300 belonging to Pasqual. When the State asked, what he learned or determined during his investigation about the weapons. Sergeant Aldape replied, that appellant "was attempting to find some buyers for those weapons." Sergeant Aldape testified that the video from the storage facility shows that when appellant and Jaquez rented the unit on February 12, Jaquez signed the paperwork under his name, and appellant gave money to Jaquez who then paid the employee of the storage facility for the unit. Sergeant Aldape clarified that appellant's name is not on the contract.

The State showed Sergeant Aldape the video of the guns sent by the Crime Stopper caller and asked him to identify rust marks on the walls of the storage unit. The State then showed Sergeant Aldape the video made by police officers of the unit rented by appellant and Jaquez and asked him to compare the rust marks on the wall. Sergeant Aldape stated the rust stains on the wall in the unit appearing in the video of the guns matched the rust stains on the wall in the video of the unit rented by appellant and Jaquez.[2] Sergeant Aldape also identified a water stain that appears on a cinder block wall in the video made by police officers that he stated matched a stain on the same level of the cinder block wall in the video of the guns allegedly made by appellant.

_____

[2] State's exhibit 3 includes a picture of the unit rented by appellant and Jaquez showing that the two side walls are made of tin and the back wall is made of cinder blocks with a cement floor.

On cross-examination, Sergeant Aldape testified that he was also involved in a consensual search of Guadalupe Elizondo's storage unit at the same storage facility where appellant and Jaquez rented their unit. Sergeant Aldape stated that no video existed of the search of Elizondo's storage unit but that the walls in Elizondo's unit were all made of tin.

## B.  Discussion

### 1.  Burglary

By his first issue, appellant contends that the evidence is insufficient because "the proof fails on identity of [appellant] as the actor" who committed the burglary, which we construe as an argument that the evidence failed to sufficiently identify appellant as the person who committed the burglary.[3] Appellant does not challenge any other element of that crime. Specifically, appellant argues that there is no direct evidence that he was the person who committed the burglary. However, direct evidence is not required. *Hooper*, 214 S.W.3d at 15. Evidence that appellant knew that Snavely was out of town, had an inoperable security system, owned guns, and had a vault, combined with evidence that appellant made the video of Snavely's guns to sell to the Crime Stoppers caller leads to a reasonable inference that appellant participated in the burglary. Moreover, by lying to police about his whereabouts on the date of the burglary, appellant showed a consciousness of guilt, which is one of the strongest kinds of evidence of guilt. *Torres*, 794 S.W.2d at 598; *see also King*, 29 S.W.3d at 565. Viewing the evidence in the light most favorable to the to the verdict, we conclude that a rational fact finder could have

---

[3] An authorized by the indictment, appellant committed the offense of burglary of a habitation "if, without the effective consent of the owner," he entered a habitation and committed a theft. *See id.* § 30.02 (West, Westlaw through 2017 1st C.S.).

9

found beyond a reasonable doubt that appellant was the person who committed the burglary. *See Whatley*, 445 S.W.3d at 166; *Brooks*, 323 S.W.3d at 898–99. Accordingly, the evidence is sufficient to support appellant's conviction of burglary. We overrule appellant's first issue.

2.    Possession of a Firearm by a Felon

By his second issue, appellant argues that the evidence is insufficient to support his conviction of possession of a firearm by a felon because there is no evidence that he personally possessed a firearm.[4] Appellant does not challenge the other elements of this offense. Specifically, appellant points out that Chief Trevino, "had no evidence that [appellant] had possession of any stolen gun" and Sergeant Aldape "said that Navarro's fingerprints did not match those Sergeant Aldape found." As previously explained there is sufficient evidence that appellant participated in the burglary of home wherein a vault with several guns was stolen. In addition, there is evidence that appellant made the video of the guns with the intent to sell those guns, which leads to a rational finding that he possessed those guns. Viewing the evidence in the light most favorable to the verdict, we conclude that a rational fact finder could have found beyond a reasonable doubt that appellant possessed a gun. *See Whatley*, 445 S.W.3d at 166; *Brooks*, 323 S.W.3d at 898–99. We overrule appellant's second issue.

3.    Theft of a Firearm

---

[4] A person commits the offense of unlawful possession of a firearm if that person has previously been convicted of a felony and possesses a firearm either "after conviction and before the fifth anniversary of the person's release from confinement of the felony or the person's release from supervision under community supervision parole, or mandatory supervision, whichever date is later." TEX. PENAL CODE ANN. § 46.04 (West, Westlaw through 2017 1st C.S.).

10

By his third issue, appellant contends that the evidence is insufficient to prove that he committed the offense of theft of a firearm because there is no evidence that he appropriated [a gun] knowing it was stolen by another or that he "acquire[d] or otherwise exercise[d] control over property . . . ."  As authorized by the indictment, appellant committed the offense of theft of a firearm, if he unlawfully appropriated a firearm with the intent to deprive the owner of the property. *Id.* § 31.03(a), (e)(4) (West, Westlaw through 2017 1st C.S.).  We construe appellant's issue as challenging that he unlawfully appropriated a firearm. [5]

As previously set out above, the evidence is sufficient to support a finding that appellant participated in the burglary of Snavely's home wherein a vault was stolen containing many guns and that appellant made a video of those guns to sell them. Snavely testified the items were taken from his house while he was out of town and no one was home.  The evidence showed that the door to Snavely's home had been pulled off, that his vault containing many guns had been taken, and that Snavely described the event as a theft of his property.  These facts lead to a reasonable inference that appellant did not have Snavely's effective consent to appropriate his property.  Viewing the evidence in the light most favorable to the verdict, we conclude that a rational fact finder could have found beyond a reasonable doubt that appellant appropriated the property

---

[5] There are three ways that appropriation of property is unlawful including the following:  (1) the appropriation "is without the owner's effective consent"; (2) "the property is stolen and the actor appropriates the property knowing it was stolen by another"; or (3) if "property in the custody of any law enforcement agency was explicitly represented by any law enforcement agent to the actor as being stolen and the actor appropriates the property believing it was stolen by another."  *Id.* § 31.03(b)(1)–(3) (West, Westlaw through 2017 1st C.S.).  Appellant only challenges the second way that appropriation of property is unlawful. However, the State's theory at trial was that appellant's appropriation of the property was unlawful because it was without the owner's effective consent.  *See id.*  Appellant does not challenge this basis for the jury's verdict.  Nonetheless, as further explained below, the evidence is sufficient in that respect.

11

without Snavely's effective consent based on the evidence and reasonable inferences from that evidence. *See Whatley*, 445 S.W.3d at 166; *Brooks*, 323 S.W.3d at 898–99. Accordingly, the evidence was sufficient to support appellant's conviction for theft of a firearm. We overrule appellant's third issue.

## II. COMMENT ON THE WEIGHT OF THE EVIDENCE

By his fourth issue, appellant contends that the trial court violated article 38.05 of the Texas Code of Criminal Procedure by improperly commenting on the weight of the evidence concerning his conviction of felon in possession of a firearm. Specifically, appellant argues that when the judge stated during appellant's closing argument, that Chief Trevino is "the chief of police. I don't know any greater qualification than that," he commented on the weight of Chief Trevino's testimony that appellant had a prior conviction. *See* TEX. CODE CRIM. PROC. 38.05 (West, Westlaw through 2017 1st C.S.). Appellant argues "[t]here was no documentary or other evidence of any prior conviction" and "[n]o person other than Police Chief Manuel Trevino testified about any prior conviction defendant had."

### A.    Applicable Law and Standard of Review

Article 38.05 of the Texas Code of Criminal Procedure, prohibits a judge from commenting on the weight of the evidence. *Id.* It states the following:

> In ruling upon the admissibility of evidence, the judge shall not discuss or comment upon the weight of the same or its bearing in the case, but shall simply decide whether or not it is admissible, nor shall he, at any stage of the proceeding previous to the return of the verdict, make any remark calculated to convey to the jury his opinion of the case.

*Id.* A trial judge must not comment on the evidence in a manner that conveys his or her opinion of the case to the jury as "[j]urors are prone to seize with alacrity upon any conduct

12

or language of the trial judge which they may interpret as shedding light upon his view of the weight of the evidence, or the merits of the issues involved." *Brown v. State*, 122 S.W.3d 794, 798 (Tex. Crim. App. 2003). "'The trial court improperly comments on the weight of the evidence if it makes a statement that implies approval of the State's argument, indicates disbelief in the defense's position, or diminishes the credibility of the defense's approach to the case.'" *Proenza v. State*, 471 S.W.2d 35, 51 (Tex. App.—Corpus Christi, 2015) *aff'd in part and rev'd and remanded in part*, 541 S.W.3d 786 (Tex. Crim. App. 2017) (quoting and citing *Simon v. State*, 203 S.W.3d 581, 590 (Tex. App.—Houston [14th Dist.] 2006, no pet.); *Hoang v. State*, 997 S.W.2d 678, 681 (Tex. App.—Texarkana 1999, no pet.)).

We must perform a non-constitutional harm analysis pursuant to rule 44.2(b) of the Texas Rules of Appellate Procedure to decide if a violation of 38.05 warrants reversal of the conviction. *Id.* 471 S.W.2d at 801. Under Rule 44.2(b), any "error, defect, irregularity, or variance that does not affect substantial rights must be disregarded." TEX. R. APP. P. 44.2(b). "A substantial right is affected when the error had a substantial and injurious effect or influence in determining the jury's verdict." *Ellis v. State*, 517 S.W.3d 922, 931 (Tex. App.—Fort Worth 2017, no pet.). If we have a "'fair assurance that the error did not influence the jury, or had but slight effect,'" the error does not affect a substantial right. *Solomon v. State*, 49 S.W.3d 356, 365 (Tex. Crim. App. 2001) (quoting *Reese v. State*, 33 S.W.3d 238, 243 (Tex. Crim. App. 2000)). When determining if the error caused harm we review the whole record, "including any testimony or physical evidence admitted for the jury's consideration, the nature of the evidence supporting the verdict, and the character of the alleged error and how it might be considered in connection with other

13

evidence in the case." *Ellis*, 517 S.W.3d at 931–32. We "may also consider the jury instructions, the State's theory and any defensive theories, whether the State emphasized the error, closing arguments, and even voir dire, if applicable." *Id.* at 932.

**B.    Analysis**

During closing argument, appellant's trial counsel stated, "Was it really proven to us today that he committed any crimes in the past? There's been testimony from an officer *unqualified to check records*, right, but what else did we see?" (Emphasis added). The State objected, and the prosecutor said, "It's a misstatement of the facts. He is *qualified to check criminal history*. He's the chief of police." (Emphasis added). The judge replied, "He's the chief of police. I don't know any greater qualification than that."

Taken in context, it is apparent that the judge's comment was meant as a response to the State's assertion that a chief of police is qualified to check the criminal history of an offender. The judge did not state that the chief of police had "great qualifications" to *testify* about appellant's criminal record as appellant claims. This interpretation is further supported by the fact that during the trial, when the State offered Chief Trevino's testimony regarding appellant's past criminal record, appellant's trial counsel objected stating, "I don't think that he's qualified to answer any criminal history background. I think that the Court can take judicial notice since the Court does have access to background information on everybody in this room." The judge asked, "What's your objection," and appellant's trial counsel replied, "Objection is, Judge, he's not qualified to answer." The trial court overruled the objection, and Chief Trevino testified about appellant's criminal history. Thus, when the judge made the complained-of comment, he was explaining the basis for his overruling appellant's trial counsel's objection that Chief Trevino is not

14

qualified to check appellant's criminal background. We disagree with appellant that the trial court's comment indicated that he believed the testimony of Chief Trevino. Thus, it does not appear to us that the judge's comment implies approval of the State's argument, indicates disbelief in the defense's position, or diminishes the credibility of the defense's approach to the case. *See Proenza*, 471 S.W.2d at 51. Accordingly, we cannot conclude that the trial court's comment violated article 38.05. We overrule appellant's fourth issue.[6]

### III.   JURY CHARGE

Next, by his fifth issue, appellant contends that the trial court commented on the weight of the evidence by instructing the jury that it should find appellant guilty if he "did then and there unlawfully, with intent to commit theft, intentionally or . . . knowingly enter a habitation without the effective consent of Nelson Snavely, who has a greater right of possession of the habitation than the defendant. . . ." Appellant argues that this instruction "injected new facts not in evidence." Appellant takes issue specifically with the trial court's instruction that Snavely, had a greater right of possession of the habitation than appellant. Appellant complains, "So, the Judge's comment on the occasion specified in the indictment is even more significant because it tells the jury that the Judge thinks that the defendant did not have the effective consent of the owner because this owner of this house 'has a greater right of possession' than the defendant." We will address appellant's issue as best as we understand it.

The trial court should not submit a jury charge that comments on the weight of the evidence. *Lacaze v. State*, 346 S.W.3d 113, 118 (Tex. App—Houston [14th Dist.] 2011,

---

[6] Although appellant claims that no other evidence regarding his status as a felon had been presented, appellant's wife testified that she had discovered that appellant was a convicted felon.

15

pet. ref'd). A charge comments on the weight of the evidence if it assumes the truth of a controverted issue or directs undue attention to particular evidence. *Id.*

The complained-of statement constitutes one of the definitions of owner that is also included in the abstract portion of this jury charge. And after reviewing the entire record, we find that appellant never claimed to have a greater right of possession of Snavely's home. During trial appellant did not contest that the burglary occurred at Snavely's home, and his trial counsel argued during opening and closing statements that "Somebody did break into the Snavely household on February 12, 2016. The only issue in this case is that it wasn't [appellant]." Accordingly, we cannot conclude that by including this definition of owner in the application paragraph, the trial court assumed the truth of a controverted issue or directed undue attention to particular evidence. *See id.* And, even assuming without deciding error, as appellant did not object to the charge, reversal requires a finding of egregious harm, which has not been shown on this record as it was uncontested that Snavely had a greater right of possession of the home than appellant, and the language in the jury charge tracked the applicable statutory definition of owner. *See Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (explaining how we review charge error); *see also Casey v. State*, 215 S.W.3d 870, 886 (Tex. Crim. App. 2007) (concluding that jury charge statement that the appellant "did administer or provide a drug, namely: [GHB] to [K. T.], the victim of the offense," without the modifier "alleged" before the term "victim" was not a comment on the weight of the evidence as the charge did not assume the truth of the controverted issue of consent and the charge tracked the language of the statute); *Itzo v. State*, No. 04-17-00036-CR, 2018 WL 1072301, at *3 (Tex. App.—San Antonio Feb. 28, 2018, pet ref'd) (mem. op., not designated for publication) (explaining

16

that the jury charge that named the person, Kelly, who was shot by the defendant in a justification instruction was not assuming the truth of a controverted issue because "Kelly's identity, or rather the undisputed fact that Kelly is the person shot by [the appellant], is not controverted. The controverted issue is [the appellant's] belief he was shooting at an unknown intruder."). Accordingly, we overrule appellant's fifth issue.

### III. CUMULATIVE HARM

By his sixth issue, appellant contends that he did not have a fair trial due to cumulative error.

Presumably to support his argument that he suffered cumulative harm, appellant cites the record for instances wherein there were no objections, such as when the State during closing argument stated that (1) "we know for sure . . . that [appellant is] a convicted felon," (2) the guns were Snavely's guns, (3) appellant had been previously convicted of burglary, and (4) the voice on the video of the guns was the voice of a co-defendant. However, appellant did not object when the complained-of statements were made. Thus, appellant's complaints concerning these statements have not been preserved and unpreserved error, if any, cannot form the predicate of a cumulative harm analysis. *See McFarland v. State*, 989 S.W.2d 749, 751 (Tex. Crim. App. 1999) (holding that in order to preserve error for review, an appellant must object to improper jury argument); *Gamboa v. State*, 296 S.W.3d 574, 585 (Tex. Crim. App. 2009) ("Though it is possible for a number of errors to cumulatively rise to the point where they become harmful, we have never found that 'non-errors may in their cumulative effect cause error.'").

Next, appellant complains that he suffered cumulative harm because the trial court admitted the video of the guns over his objection that it had not been properly authenticated. Appellant does not provide a clear and concise argument with citation to appropriate authority to support a conclusion that the video was inadmissible. *See* TEX. R. APP. P. 38.1(i). Nonetheless, even assuming error, there are no other errors for there to have been cumulative harm. *See Gamboa*, 296 S.W.3d at 585; *see also Priddy v. State*, No. 02-13-00586-CR, 2014 WL 5307180, at *1 (Tex. App. — Fort Worth Oct. 16, 2014, no pet.) (mem. op., not designated for publication) ("The doctrine of cumulative error provides that the cumulative effect of several errors can, in the aggregate, constitute reversible error, even though no single instance of error would.") (citing *Chamberlain v. State*, 998 S.W.2d 230, 238 (Tex. Crim. App. 1999)).

Appellant makes a multifarious argument regarding the other instances that he claims constituted cumulative error, and we are not able to address these complaints as appellant has not provided a clear and concise argument with citation to appropriate authority.[7] *See* TEX. R. APP. P. 38.1(i). Accordingly, we overrule appellant's sixth issue.

## IV. CONCLUSION

We affirm the trial court's judgment.

---

[7] For example, appellant complains that he did not have a fair trial arguing "[e]vidence of codefendant's recent possession of stolen property, one of the guns charged to have been stolen, was admitted into evidence" and "[a] rational jury could not have convicted Navarro of burglary on this evidence. The proof fails on identity." However, appellant acknowledges that there was no objection to this evidence, and he does not explain further how we may reverse for cumulative error when there was no objection, and he has not argued why this was erroneous. Next, appellant argues that he did not have a fair trial because "[d]ouble hearsay accusing [him] of having had one of the guns stolen in the burglary and of having handed it to the declarant was admitted over objection." Appellant cites the instance wherein he claims error occurred; however, he provides no citation to any supporting authority or any analysis explaining why the trial court erred in overruling his objection. The rest of appellant's complaints are presented as a list of grievances without citation to appropriate authority or any analysis of his perceived errors. *See* TEX. R. APP. P. 38.1(i).

18

**/s/ Rogelio Valdez**
ROGELIO VALDEZ
Chief Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed this
12th day of July, 2018.