

## Fourth Court of Appeals
### San Antonio, Texas

### MEMORANDUM OPINION

No. 04-24-00204-CR

Jose Angel **RUIZ**,
Appellant

v.

The **STATE OF TEXAS**,
Appellee

From the 187th Judicial District Court, Bexar County, Texas
Trial Court No. 2022CR4248A
Honorable Stephanie R. Boyd, Judge Presiding

Opinion by:  Velia J. Meza, Justice

Sitting:  Rebeca C. Martinez, Chief Justice
Lori Massey Brissette, Justice
Velia J. Meza, Justice

Delivered and Filed: March 19, 2025

AFFIRMED AS MODIFIED

This appeal arises from the conviction of Jose Angel Ruiz relating to his involvement in the death of a five-year-old child. Ruiz was convicted of serious bodily injury to a child, aggravated assault with a deadly weapon, and six counts of injury to a child.[1]

---

[1] The jury sentenced Ruiz to a term of life imprisonment on the serious bodily injury charge, 20 years on the aggravated assault charge, and 10 years for each of the six injury-to-a-child charges.

On appeal, Ruiz argues there was (1) insufficient corroboration of accomplice-witness testimony; and (2) an improper judicial comment on the weight of the evidence.

## BACKGROUND

On February 7, 2022, five-year-old M.L. arrived in the emergency room of Texas Vista Hospital in San Antonio, Texas, in a condition the medical staff would later describe as "level three unresponsive." Gustavo Cervantes, an emergency room nurse of sixteen years, immediately identified that the child was not breathing and had no pulse. Cervantes started chest compressions. In trying to administer CPR, Cervantes found mashed bananas in the child's mouth and had to digitally remove the same to establish an airway. The medical staff also tried to establish IV access, but found the veins were not "giving return," meaning that the veins were not giving a return of blood, indicating a lack of blood circulation. Cervantes also observed M.L.'s skin was ashen. The medical team declared M.L. dead within fourteen minutes of her arrival at the emergency room.

Medical records admitted at trial showed that M.L. presented to the emergency room with "generalized bruising all over her body . . . scratches, missing areas of hair, wounds to her feet, and toenails missing." Due to the condition of her body, the San Antonio Police Department (SAPD) and Child Protective Services (CPS) immediately responded to the hospital.

*Testimony of Medical Examiners*

The State and Defense each called a medical examiner to testify at trial. The State called Dr. Kimberly Molina while the Defense called Dr. Rajesh Kannan. Both doctors agreed the child died from complications caused by blunt force injuries. Dr. Kannan performed the autopsy and wrote the autopsy report. Dr. Molina, as Chief Medical Examiner, reviewed and approved the autopsy report.

According to Dr. Molina, the child had a laceration on the head with accompanying internal bruising of the scalp, but no significant brain injuries. Dr. Molina testified the child had a small fracture on the spine in the lower thoracic area. In her opinion, such fractures occur with blunt force injuries or overextension of the back. Dr. Molina testified that M.L.'s kidneys showed signs of failure and thus additional microscopic testing of the kidney was conducted, confirming the existence of myoglobin. Dr. Molina explained that myoglobin is a muscle protein that causes kidney failure if released into the bloodstream: this disease process is termed rhabdomyolysis, or "rhabdo" for short. According to Dr. Molina, rhabdo is caused by trauma or overexertion. She explained that the autopsy found the rhabdo was likely caused by the injuries M.L. sustained. Dr. Molina explained that rhabdo could pose a "substantial risk of death."

Dr. Kannan similarly testified the child "suffered trauma . . . extensive . . . from top to bottom . . . all over the body." Dr. Kannan conducted a comprehensive study of all tissues and major organs, including heart, lungs, liver, adrenal, pancreas, thymus, intestines, and kidneys. He also tested the spleen to look for myoglobin. Dr. Kannan noted the injuries on the child's mouth area were showing signs of healing. He observed missing teeth and explained it was uncommon for a "child to have quite a few teeth missing with overlaying trauma in different stages of healing." Dr. Kannan testified the bruises on the child's scalp appeared "recent." During direct examination, the defense inquired into a "cluster of three contusions measuring 1 to 2 centimeters present in lower left abdomen." Dr. Kannan explained that those injuries were "some kind of blunt trauma . . . [a]nd I can't really tell exact mechanism how it happened." Overall, however, Dr. Kannan described the injuries to the child as "soft tissue injuries . . . and not the immediate cause of death." Instead, Dr. Kannan concluded "the child was deteriorating for quite a while." As to the cause of the child's death, Dr. Kannan testified the child's kidneys failed around the time of death

as evidenced by the rhabdo finding. Specifically, he explained that "whatever you see on the skin is affecting the muscles under them." "[D]ue to the repeated trauma . . . the muscles, over time, break down," and small pieces of the muscle escape into the bloodstream causing the kidney to fail.

*Testimony of Child Protective Services*

Anthony Adame, a special investigator for the Texas Department of Family and Protective Services (the Department or DFPS) responded to the hospital for a child death investigation. As part of his duties for the Department, Adame works alongside law enforcement to document any evidence of abuse or neglect of a child in the event the department must intervene. Adame examined and photographed M.L.'s bruises and looked for signs of abuse or neglect. He testified he counted approximately ten "pinpoints" at the bottom of her feet and noted two toenails missing on her left foot. Adame documented a pattern of marking on her left leg and thigh with a distinguished bruising pattern, and severe bruising to the child's hands and both sides of the child's hips. Adame also noted significant bruising that included cuts and abrasions to the child's chest, neck, and face. Adame observed M.L. was missing a significant portion of her hair. Lastly, Adame was present during SAPD's custodial interview of Ruiz and personally interviewed the child's mother, Katrina Mendoza, later that evening. Adame observed J.L.'s forensic interview and interviewed Ruiz's neighbors for his part of the investigation.

Julie Rummel, also a Department investigator, responded to the hospital and was specifically assigned to M.L.'s six-year-old sister, J.L. Rummel saw no bruising on J.L., and noted the child appeared well-nourished and clean. Rummel was also involved in the inspection of M.L.'s body in her role as a CPS investigator. She testified she saw "missing teeth, toenails missing . . . there were little, like thumbtack wounds on the bottom of her feet . . . clumps of hair

missing . . . it was very, very bad." Rummel removed J.L. from Mendoza and set up the child forensic interview.

*Child Forensic Interview of J.L.*

J.L. was interviewed at Child Safe by a forensic interviewer, the video of which was introduced into evidence at trial by the Defense. The interview was conducted several days after M.L. died and after J.L. was removed from Mendoza's possession. During the interview, J.L. described the events that led to M.L. going to the hospital. At the time, Mendoza was temporarily living at a friend's apartment, without Ruiz. J.L. recalled her mother, Mendoza, "giving breaths" and "mouth to mouth" assistance to her sister. J.L. stated that her mom went upstairs "because she didn't want to see M.L." J.L. explained that they then went to Ruiz's apartment. There, J.L. saw Ruiz patting M.L.'s back "like he was hugging her." After M.L. threw up, J.L. saw that her sister "did not wake up any longer." J.L. recounted her mom crying and "they took [M.L.] to the doctor."

J.L. also explained many of the bruises on her sister's body. She started by describing the injuries to M.L.'s feet. She told the forensic interviewer that her sister's toes were "looking bad" and that M.L. complained of pain to her toes. J.L. explained that one time she opened the bedroom door to let M.L. in and saw the bruises and heard M.L. say "ouch." J.L. said, "she was bruised all right here" (motioning to her feet). J.L. explained the bruising to M.L.'s feet was from Mendoza stepping on M.L.'s feet.

J.L. also observed Ruiz "pushing" thumbtacks into M.L.'s feet, while M.L. was on the floor laying down. She said Ruiz would punish M.L. by putting her in the closet and making her stand on the thumbtacks.

J.L. told the interviewer that after M.L. would wet herself, Ruiz would put her face in the urine and make her lick it. J.L. said her sister was on the floor screaming "no" and Ruiz would yell back "lick the pee."

When asked about any bruises to the face, cheek, or mouth area, J.L. explained that one time, Ruiz slapped M.L. causing "two teeth [to] c[o]me out.," and motioned with an open hand. J.L. also recalled a time when M.L. tried to drink some milk "but her lip was all messed up, it was popped." She also reported seeing M.L's face, cheek, mouth, and hair as "all bloody."

J.L. explained that both Ruiz and Mendoza "whooped" her sister. She explained Mendoza gave M.L. two "big whoopings," one with a belt and one with a "chancla." She witnessed Ruiz hitting M.L. "on her butt with the metal part of the belt" while M.L. had her hands stretched out on the bed. J.L. explained that Ruiz "kept hitting her" and she could hear her sister screaming: "like crying screaming."

Lastly, J.L. explained that everything she saw occurred at Ruiz's apartment.

*Testimony of Katrina Mendoza, Child's Mother*

Mendoza testified on behalf of the State. In exchange for her testimony in this case, Mendoza negotiated a plea agreement with the State. The terms of the agreement called for an opposed application for probation with punishment not to exceed forty-five years imprisonment. Throughout her testimony, Mendoza acknowledged that while she had some fault, it was Ruiz who beat M.L. to death.

Mendoza testified she had two daughters: J.L. (6) and M.L. (5). She became pregnant with J.L. when she was fourteen years old. CPS became involved multiple times in her life starting when M.L. was a couple of months old. Ultimately, the children were never removed from her custody. Mendoza testified that her last contact with CPS was two weeks before M.L. died,

involving allegations she was "abusing the girls." On the day CPS made contact with Mendoza, the caseworker photographed M.L., who appeared to have no bruises on her body.

Mendoza admitted she was in a dating relationship with Ruiz. They met in 2020 while she was working at Diamonds Show Club. Mendoza described the relationship with Ruiz as "on and off." Mendoza would take the girls and spend a few nights at Ruiz's apartment. However, she explained she only lived at his apartment "consistently" for the three weeks prior to M.L. dying.

According to Mendoza, Ruiz would discipline her daughters even before she lived with him for those three weeks. She testified that Ruiz would spank them, pull M.L.'s hair, cover her mouth and nose, and use thumbtacks on her feet.

Mendoza admitted she asked Ruiz for help with the discipline of M.L. on one occasion. He picked up the child and returned her the next day. While the child was with Ruiz, Mendoza claimed they talked over the phone and communicated through text and video chat. Ruiz sent her a photograph and video where the child is seen in the car holding up her arms while holding a box. When M.L. returned home, she was drenched in water, or some other liquid: Ruiz explained she wouldn't stop crying so he threw water at her. Mendoza also testified that the child had bruises in her inner thighs, "it was swollen, purple, almost black." Mendoza confronted Ruiz about the bruising in M.L.'s inner thighs. While Ruiz admitted to pinching the child, but he said he didn't realize how hard he was pinching and promised to not do it again.

Mendoza testified Ruiz would continue to "punish" M.L. by pulling her hair, spanking her with the metal part of a belt, covering her mouth and nose, not letting her eat, keeping her standing for hours at a time, and depriving her of any sleep. Mendoza testified that Ruiz would cover M.L.'s mouth and nose until she fell unconscious. When the child passed out, Mendoza testified Ruiz would "blow into her mouth like CPR." Mendoza testified that this happened twice.

Mendoza testified that Ruiz would "put thumbtacks on M.L.'s feet and butt." If the child was in time-out and didn't comply with the directives of Ruiz, he would "pull her hair, [and] hit her hands with the phone or her feet with the phone." Mendoza described a different event where Ruiz tied "like a thin pole to her arms and like wrapped it around the pole." She also testified Ruiz would "mop the floor" with M.L. when she had an accident: "he would get her on the ground and just drag her in her urine." According to Mendoza, Ruiz would "put a sock or clothing in her mouth" when the child would cry. Mendoza claimed that she tried to get Ruiz to stop doing these things, but he didn't listen. The final event that led Mendoza to her leaving Ruiz's apartment was when Ruiz put dog feces all over M.L.'s face. A photograph extracted from Ruiz's cell phone showing M.L.'s face covered in feces was admitted at trial.

Mendoza testified she moved to her friend Jeanette's house and did not see Ruiz for two and a half days. According to Mendoza, all the events occurred when she and her daughters lived with Ruiz. Mendoza admitted that it was the same time frame when the CPS investigation based on allegations of abuse towards the children was ongoing.

Mendoza admitted that she too disciplined M.L. by spanking her with a belt, pulling M.L.'s hair, and putting her in time-out. She alleged that even J.L. took part in pulling M.L.'s hair at the instruction of Ruiz.

During a lengthy cross-examination, Mendoza admitted that the police went to Ruiz's apartment on two or three occasions for noise complaints. She explained that the final time the police were called, it was "at night." Neither Mendoza nor Ruiz answered the door. Mendoza claimed that she didn't open the door because M.L. had bruises and that Ruiz threatened her not to open the door because he was "going to shoot inside the house." Mendoza admitted that she didn't leave Ruiz despite him beating M.L. to death because she was in love with him.

On the day M.L. died, Mendoza testified she gave the child bananas, ramen soup, and Danimals yogurt in the morning. She claimed the child fed herself and denied shoving a spoon down the child's throat. Mendoza testified that she had gone to a job interview. When she returned home in the afternoon, M.L. appeared sick, "like her body didn't look okay." Mendoza said that M.L. hit her head on a lamp but did not lose consciousness. Mendoza testified she took her daughters back to Ruiz's apartment, which was in the same apartment complex, and M.L. was "throwing up really bad." She also noticed her daughter's feet were cold to the touch. She decided to take M.L. to the hospital and couldn't tell if the child was breathing during the car ride. Mendoza testified that when she arrived at the hospital, M.L. died quickly: "not too long later, they said she didn't make it."

*Testimony of Detective Justin Knox*

SAPD Detective Justin Knox testified that he examined the contents of Ruiz's cell phone. Detective Knox testified that he works in the digital forensics unit as part of his assignment to the United States Secret Service Electronic Crimes Task Force: his primary role is to gather and preserve digital evidence for SAPD. Pursuant to a search warrant, Detective Knox conducted an analysis of Ruiz's phone with a commonly used software in the industry, Cellebrite, to extract the data. The extraction included data of call logs, text messages, videos, and images.

Detective Knox explained that the images and videos the State introduced into evidence were taken from a specific folder in Ruiz's phone. As the detective explained, when a phone takes a photo, it automatically stores it in the "camera roll." The folder is called the digital camera images (DCIM) folder. The photos in that folder consisted of images of M.L. with injuries on different parts of her body. The photos and videos were stamped with dates and times beginning January 31, 2022 and ending February 5, 2022.

According to Knox, Ruiz's phone contained a video showing Ruiz and M.L. driving in a car alone together. That video was played for the jury and depicts Ruiz driving while M.L. is in the back passenger seat. There are no other occupants in the car. The camera's view captures the car's rooftop, but fully captures all the voices and sounds. M.L. can be heard saying things like her "hand hurts," pleading with Ruiz to allow her to sleep, and pleading that her lips were dry. Ruiz can be heard screaming at the child, "get your f--king ass off the door" and ordering M.L. to pick up her arms. Throughout the video, Ruiz can be seen and heard striking M.L. who is screaming and apologizing as she is hit. The video also shows a second phone: a black smartphone with a cracked screen. The phone is located in the passenger seat next to an apparent USB charger and packs of "Swisher Sweets" cigarillos packets.

*Testimony of Homicide Detective Lawrence Saiz*

Detective Lawrence Saiz, a homicide detective for SAPD, responded to the scene of the hospital emergency room where M.L. died. From the call assigning him the case, Detective Saiz knew he was walking into "a bad case, a bad situation." After getting quickly briefed on the matter he directed himself to the room where the child M.L. was located. Saiz observed M.L. lying on the examination table, uncovered, and saw extensive bruises all over her body. Saiz attended the autopsy and reviewed the forensic interview of J.L. He also secured a search warrants for Ruiz's cell phone and apartment.

Detective Saiz testified that he interviewed Ruiz, who in his opinion, attempted to shift blame to Mendoza. During the interview, Saiz could see scrapes and marks on Ruiz's knuckles. He testified that Ruiz admitted to putting M.L. in time-out and making her raise her hands to the side and keep them lifted. Ruiz further admitted that he pinched M.L. in the inner thigh and struck her.

*Recorded Statement of Jose Angel Ruiz*

During Ruiz's recorded statement to Detective Saiz, which was introduced without objection, Ruiz admitted to being in a dating relationship with Mendoza and agreed they met while Mendoza was a stripper. Ruiz explained that Mendoza only started bringing the child M.L to his apartment in the previous three months. He stated Mendoza did not initially bring M.L. to the apartment because "she couldn't handle her." Ruiz explained that M.L. was defiant, loud, unable to sit still, "do[es] whatever she wants," and had "no discipline." Ruiz claimed it was Mendoza who "whooped" M.L. with the belt and that he intervened to stop Mendoza.

Ruiz initially took no responsibility for M.L.'s torture and eventual death. He insisted that "she was fine, she was good when she left my apartment." He told the Detective that Mendoza left his apartment with the girls on the Friday prior to M.L.'s death. Ruiz explained that he was in the process of moving out and relocating to a different apartment. Ruiz told the Detective that he did not see Mendoza or the children, but the pair were in communication by text the entire weekend while he was busy moving to another apartment.

Ruiz continued to explain that he received a phone call from Mendoza on Monday, February 7, 2022. Mendoza told him to get to her friend's apartment, where she was staying, because something was wrong with M.L. Ruiz stated he stopped at the store to get "some shakes" for the child and made another stop at a fast-food restaurant. Mendoza called him again urging him to get to the apartment immediately. Ruiz claims he walked into the apartment and saw M.L. on the couch struggling to breath. Ruiz explained to the Detective that "she's done this before," i.e. that the child would make herself stop breathing in the past. Ruiz said he started chest compressions on the child, and she started breathing again, opened her eyes, and started talking. Ruiz explained that Mendoza and the girls relocated to Ruiz's apartment.

At his apartment, Ruiz claimed M.L. "was good." Ruiz's explanation of the events vacillated between the child being "good" and "bad." M.L. continued to have difficulty breathing and he described a second time he saw "her eyes were rolling back." Ruiz claimed to give the child more chest compressions and that time, causing M.L. to vomit "a whole lot of food." The third time M.L. appeared to stop breathing, Ruiz explained he was forced to take M.L. to the hospital because there was nothing else he could do. Ruiz explained that it was his guess, based on the child throwing up, that it was all the food in the child's system that killed her.

After hearing Ruiz's version of events, Detective Saiz gave Ruiz his opinion that the child had been tortured and beat from head to toe. Saiz explained that from his investigation, only two adults had access to M.L. Ruiz denied torturing the child. Ruiz also claimed to have no knowledge of how the child got bruises prior to his two- or three-day separation from Mendoza. After Detective Saiz told Ruiz that in his opinion, Ruiz was "a killer," Ruiz became irate at the Detective and yelled, "she was fine, she was fine, she was good!"

Thereafter, Ruiz made several admissions related to the charges in this case. He admitted to disciplining M.L. by "putting her in the f--king corner" and "smack[ing] her in the ass." "I put her on her f--king knees . . . put her on her knees . . . put her hands out like that . . . and that's it . . . you cry, whoop her on the butt."

Ruiz admitted to pinching the child "right here . . . when she was sitting . . . right here." With regards to the child's missing hair, Ruiz told Detective Saiz that J.L. pulled M.L.'s hair out at the instruction of Mendoza. He admitted he helped with the spankings and "whoopings" by holding M.L.'s arms and legs down while Mendoza hit her.

*Testimony of Neighbors at Henry B. Apartments*

Several of Ruiz's neighbors at the apartment complex were called to testify at trial. A student at the UT Health Science Center testified that his apartment was located above Ruiz's apartment. He recalled hearing a child crying in Ruiz's apartment as early as November 2021. He called the police on three occasions due to the noise coming from Ruiz's apartment and the sound of a child crying. He reported hearing a male voice yelling at the child, then banging like physical contact was made with the child, and the child screaming "ow, ow, ow." The child's crying was described as "prolonged" and intense "wailing."

At trial the State introduced these 911 calls. This neighbor had called for police assistance on November 30, 2021, and December 1, 2021. He notified the operator that he could hear the child crying for the past 20 minutes and believed the father was beating the child. The neighbor identified Ruiz and stated that the sounds were coming from Ruiz's apartment.

Another neighbor testified at trial. This neighbor shared an adjoining wall with Ruiz and reported hearing hitting, yelling, and kids crying coming from Ruiz's apartment. She heard both male and female voices yelling and cussing. The neighbor heard a child yelling "no, Dad stop." The neighbor consistently heard the adults yelling "M.L., stop," and the female voice yelling "M.L." a lot. She heard "slaps or punches" along with the screaming. The neighbor testified that she saw the female adult leaving the apartment with the two girls in February 2022, and they did not return. She noticed both children were wearing big puffy coats, like parka-style, and explained the weather that day did not call for such big coats.

**DISCUSSION**

**1.** ***Accomplice Witness Rule***

In his first appellate issue, Ruiz complains that the non-accomplice evidence was insufficient to corroborate the testimony of Mendoza as to each respective count in the indictment.

The accomplice-witness rule provides that "[a] conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed[,] and the corroboration is not sufficient if it merely shows the commission of the offense." TEX. CODE CRIM. PROC. art. 38.14.

The accomplice-witness rule is a statutorily imposed sufficiency review and is not derived from federal or state constitutional principles that define the usual legal and factual sufficiency standards. *Druery v. State*, 225 S.W.3d 491, 498 (Tex. Crim. App. 2007); *see also Cathey v. State*, 992 S.W.2d 460, 462–63 & n.4 (Tex. Crim. App. 1999) (distinguishing usual sufficiency review from the accomplice-witness standard of review). When evaluating the sufficiency of corroboration evidence under the accomplice-witness rule, we "eliminate the accomplice testimony from consideration and then examine the remaining portions of the record to see if there is any evidence that tends to connect the accused with the commission of the crime." *Solomon v. State*, 49 S.W.3d 356, 361 (Tex. Crim. App. 2001).

The sufficiency of non-accomplice evidence is judged according to the facts and circumstances of each case. *Smith v. State*, 332 S.W.3d 425, 442 (Tex. Crim. App. 2011). We do not independently construe the non-accomplice evidence but instead defer to the factfinder's resolution of it. *Id.*

"The tends-to-connect standard presents a low hurdle for the State." *Patterson v. State,* 204 S.W.3d 852, 859 (Tex. App.—Corpus Christi 2006, pet. ref'd). "There must simply be *some* non-

accomplice evidence which *tends* to connect appellant to the commission of the offense alleged in the indictment." *Castillo v. State*, 221 S.W.3d 689, 691 (Tex. Crim. App. 2007). "[T]he corroborating evidence need not prove the defendant's guilt beyond a reasonable doubt by itself." *Malone v. State*, 253 S.W.3d 253, 257 (Tex. Crim. App. 2008). Nor is it necessary for the corroborating evidence to directly link the accused to the commission of the offense. *State v. Ambrose*, 487 S.W.3d 587, 593 (Tex. Crim. App. 2016); *Cathey*, 992 S.W.2d at 462. Rather, the evidence, whether direct, circumstantial, or both, must show that rational jurors could have found it sufficiently tended to connect the accused to the offense. *Smith*, 332 S.W.3d at 442; *Simmons v. State*, 282 S.W.3d 504, 508 (Tex. Crim. App. 2009) ("when there are two permissible views of the evidence (one tending to connect the defendant to the offense and the other not tending to connect the defendant to the offense), appellate courts should defer to that view of the evidence chosen by the fact-finder.").

While a defendant's mere presence at the scene of a crime is insufficient to corroborate accomplice testimony, *Druery*, 225 S.W.3d at 498, "proof that the accused was at or near the scene of the crime at or about the time of its commission, when coupled with other suspicious circumstances, may tend to connect the accused to the crime so as to furnish sufficient corroboration to support a conviction." *Smith*, 332 S.W.3d at 443 (quoting *Richardson v. State*, 879 S.W.2d 874, 880 (Tex. Crim. App. 1993) (internal quotation marks omitted)). Additionally, circumstances that are apparently insignificant may nevertheless constitute sufficient evidence of corroboration. *Trevino v. State*, 991 S.W.2d 849, 852 (Tex. Crim. App. 1999); *Simmons v. State*, 205 S.W.3d 65, 73 (Tex. App.—Fort Worth 2006, no pet.). Finally, an accomplice's out-of-court statement may not be used as corroboration, *Smith*, 332 S.W.3d at 439, but it is also not evidence

requiring corroboration under Article 38.14, *Bingham v. State*, 913 S.W.2d 208, 213 (Tex. Crim. App. 1995) (op. on reh'g).

If the State does not satisfy its burden to corroborate accomplice-witness testimony, the appellate remedy is to reverse and render judgment of acquittal. *See Cathey*, 992 S.W.2d at 463, n.2 (citing TEX. CODE. CRIM. P. art. 38.17); *Wincott v. State*, 59 S.W.3d 691, 703 (Tex. App.— Austin 2001, pet. ref'd).

### 1.1 *Non-Accomplice Evidence*

*Count I Injury to a Child Causing Serious Bodily Injury*

Count I of the indictment charged Ruiz with intentionally or knowingly causing serious bodily injury to a child. TEX. PENAL CODE § 22.04(a)(1). Count I was submitted to the jury as two disjunctive paragraphs alleging alternate manner and means of committing the offense. However, Ruiz asserts that the non-accomplice evidence is insufficient to support only the first paragraph of Count I—Ruiz does not challenge the alternative manner and means contained in the second paragraph.

Additionally, prior to the beginning of jury selection, the State moved, without objection, to amend the indictment to remove the language in Count I Ruiz now challenges on appeal as lacking corroboration. "After notice to the defendant, a matter of form or substance in an indictment or information may be amended at any time before the date the trial on the merits commences." TEX. CODE CRIM. PROC. art. 28.10. The indictment may be amended after trial commences "if the defendant does not object." *Id.*

The jury must unanimously find the defendant committed the same, single, specific criminal act. *Ngo v. State,* 175 S.W.3d 738, 745 (Tex. Crim. App. 2005). However, "this does not mean that the jury must unanimously find that the defendant committed that crime in one specific

way or even with one specific act." *Floyd v. State*, — S.W.3d —, —, No. PD-0148-23, 2024 WL 4757855, at *3 (Tex. Crim. App. Nov. 13, 2024), reh'g denied (Jan. 22, 2025). Because Ruiz only challenges one manner and means charged in the first paragraph of Count I and does not challenge the alternative manner and means contained in the same count, and the jury could have relied on either, we decline to analyze Ruiz's complaint regarding the first paragraph.

*Count II Aggravated Assault with a Deadly Weapon*

Count II of the indictment charged Ruiz with exhibiting a deadly weapon—his hands— and intentionally, knowingly or recklessly causing bodily injury by covering M.L.'s mouth and nose with his hand. TEX. PENAL CODE § 22.02(a). Ruiz argues there is no evidence corroborating Mendoza's testimony as to aggravated assault. Ruiz also contends that no other witness ever named him as a person who covered the mouth and nose of M.L., causing her to pass out. The evidence proves otherwise.

Aggravated assault "is a result-oriented statute, and the gravamen of the statute is 'causing bodily injury.'" *Gunter v. State*, 673 S.W.3d 335, 344 (Tex. App.—Corpus Christi–Edinburg 2023, pet. ref'd) (quoting *Landrian v. State*, 268 S.W.3d 532, 539 (Tex. Crim. App. 2008)). Therefore, we consider any evidence that tends to connect Ruiz to bodily injury inflicted upon M.L. *See* TEX. PENAL CODE § 22.04(h) ("A person who is subject to prosecution under both [section 22.04, defining injury to a child,] and another section of [the penal] code may be prosecuted under either or both sections.").

There was extensive non-accomplice evidence showing that Ruiz physically abused M.L. causing bodily injuries. Ruiz admitted to beating and pinching M.L. as punishments, and a video recovered from his phone showed him hitting M.L. while she pled for forgiveness. J.L. observed Ruiz slap M.L. in the face so hard "two teeth came out" and described her five-year-old sister's

face, cheek, mouth, and hair as "all bloody." Shortly before she was pronounced dead, medical professionals observed that M.L.'s body was bruised from head to toe.

The jury was also entitled to consider Ruiz's secretive, strange, or suspicious behavior after M.L.'s death as evidence tending to connect him to her injuries. *Smith*, 332 S.W.3d at 445–47 (considering evidence that a wife accused of murdering her husband (1) jokingly referred to herself by her maiden name after her husband was murdered, (2) made mean-spirited remarks towards the husband, (3) volunteered information about her non-existent sex life, and (4) likely disposed of the guns used to murder her husband). In Ruiz's recorded statements to both Detective Lloyd and Detective Saiz, he blamed M.L. for holding her own breath causing her to pass out. Ruiz claimed (1) this happened at least two times before; and (2) on the day M.L. died, the child was engaging in the same type of behavior. Additionally, Dr. Kannan testified that he refused to rule out asphyxia as a cause of death. He testified that "in a child with extensive trauma, and with prior history of trauma, and especially with a history of asphyxia event in the past, I cannot for sure rule out the same happened again." The jury, "as the sole judge of the weight and credibility of the evidence," was entitled to disbelieve Ruiz's explanation for M.L. losing consciousness. Jackson v. Virginia, 443 U.S. 307, 319 (1979). Given his attempt to shift blame from himself to the deceased child, the jury could have reasonably inferred Ruiz was conscious of his guilt and was attempting to hide his involvement with her death. *See Duran v. State*, No. 08-08-00288-CR, 2010 WL 2621688, at *5 (Tex. App.—El Paso June 30, 2010, no pet.) (not designated for publication) (mother's attempt to shift blame to young daughter for newborn baby's injuries constituted evidence of consciousness of guilt); *Harris v. State*, 645 S.W.2d 447, 456 (Tex. Crim. App. 1983) (noting "consciousness of guilt" is "one of the strongest kinds of evidence of guilt").

Giving proper deference to the jury's role in making reasonable inferences from the evidence, we conclude the cumulative force of the non-accomplice evidence tends to connect Ruiz to the aggravated assault of M.L. *Smith*, 332 S.W.3d at 442; *Simmons*, 282 S.W.3d at 508.

*Counts III–VII Bodily Injury to a Child*

Counts III–VIII each charged Ruiz with causing bodily injury to a child on different occasions and by different manner and means.

Count III charged Ruiz with causing bodily injury by striking M.L. with his hand. Ruiz argues no other witness provided evidence that he struck M.L. with his hands, spanking or otherwise. The evidence tells a different story. Ruiz admitted to Detective Saiz that he spanked M.L. with his hands. Additionally, the State introduced photos and videos captured on Ruiz's phone that show Ruiz repeatedly striking the child while riding in a car with her.

Count IV alleged Ruiz caused bodily injury to the child by pinching M.L. with his hand. Ruiz argues that no witness corroborated Mendoza's testimony that he pinched the child in the inner thighs. Here again, during Ruiz's recorded statement to Detective Saiz, he admitted to pinching the child with his hand.

Count V alleged that Ruiz caused bodily injury to M.L. by inserting tacks into her feet. Ruiz argues that except for Mendoza, no other witness testified that "they observed" Ruiz placing thumbtacks on M.L.'s feet. Ruiz, however, introduced a recording of J.L.'s forensic interview following M.L.'s death. In the recording, J.L. detailed how she saw Ruiz putting the thumbtacks on M.L.'s feet while she laid on the floor crying.

Count VI charged Ruiz with causing bodily injury to M.L. by striking her with a belt. Ruiz argues that Detective Saiz did not show who struck M.L. with a belt. In fact, he claimed it was

Mendoza who admitted to striking M.L. with a belt. The jury saw J.L.'s statement to the forensic interviewer. She detailed how Ruiz spanked M.L. with the metal part of his belt.

Count VII charged Ruiz with causing bodily injury to M.L. by pulling her hair with his hand. Ruiz argues the State did not provide evidence corroborating Mendoza's claims that Ruiz pulled the child's hair. The evidence showed that CPS was investigating allegations of child abuse by Mendoza. The state introduced a photograph showing M.L. on the day that CPS contacted the family, on January 19, 2022. The photograph shows M.L. with a full head of hair. On the day of her death, M.L. was missing a significant portion of her hair. The State introduced photographs of Ruiz's apartment showing clumps of hair on the floor. Ruiz denied that he pulled the child's hair. In fact, he explained in his statement that the child J.L. pulled out M.L.'s hair, and that she did so at the instruction of Mendoza.

Count VIII alleged that Ruiz caused bodily injury to M.L. by striking her with a cell phone. Ruiz argues there is no independent corroboration that he struck the child with a cell phone. State's Exhibit 108 is a video made by Ruiz's cell phone on the day and time he admitted to picking up the child from Mendoza for the purpose of "disciplining her." In fact, the video shows Ruiz striking the child repeatedly while making her hold her arms up. The video further shows a second phone with a cracked screen, not the phone used in the recording, laying in the passenger seat next to a USB charger and two cigarillo packs. While there are portions of the recording that go dark, the audio portion of the recording is clear that Ruiz is striking the child with an object and the child is heard screaming and crying. The jury also saw a photograph depicting the child's arms and faced bandaged. The jury also heard from DFPS special investigator Adame that M.L. had significant bruising to her hands.

*Additional "Suspicious" Circumstances*

The State argues that there are further suspicious circumstances corroborating Mendoza's testimony. In her forensic interview, J.L. states that Ruiz would punish M.L. by locking the child in closet and forcing her to lick her urine off the floor. Ruiz admitted to detectives that he helped Mendoza "discipline" M.L., including forcing the child to hold her hands in the air for extended periods. The search of Ruiz's apartment revealed first-aid materials that Mendoza testified were used to treat M.L.'s cuts and bruises. A photo on Ruiz's phone depicted M.L.'s arms and face bandaged.

The State argues that, in several videos extracted from Ruiz's phone, Ruiz can be heard scolding M.L. when she says she's in pain. In one video, Ruiz tells M.L., "Didn't I tell you it's not going to be fun at my house?"

Ruiz's neighbors testified they could hear "prolonged . . . wailing" and the sound of a child crying coming from Ruiz's apartment in the months prior to M.L.'s death. One neighbor reported often hearing a male voice, banging and the sound of a child being hit, followed by a child screaming "ow, ow, ow." Another described the sounds of hitting, yelling, and children crying. The neighbors visually identified Ruiz as the apartment's resident.

Lastly, in Ruiz's jail calls, Ruiz is heard telling a caller "if the autopsy comes back, ni\*\*\* and I'm in jail, I'm staying in jail."

We also observe the trial court correctly instructed the jury that it could not convict Ruiz of the offenses charged unless the accomplice testimony was corroborated by other evidence tending to connect Ruiz to those offenses. *See Cantelon v. State*, 85 S.W.3d 457, 461–62 (Tex. App.—Austin 2002, no pet.); *Smith*, 332 S.W.3d at 442 ("[I]t is not appropriate for appellate courts to independently construe the non-accomplice evidence."). "All the law requires is that there be

*some* non-accomplice evidence which *tends* to connect the accused to the commission of the offense." *Hernandez v. State*, 939 S.W.2d 173, 178 (Tex. Crim. App. 1997).

We conclude the non-accomplice evidence relevant to each count "tends to connect" Ruiz to bodily injury inflicted upon M.L. Ruiz's first issue is overruled.

## 2. *Judicial Remarks During Voir Dire*

*Applicable Law and Standard of Review*

Article 38.05 prohibits a judge from making "any remark calculated to convey to the jury his opinion of the case" prior to the return of the verdict. TEX. CODE CRIM. P. art. 38.05. A comment violates this statute if it is "reasonably calculated to benefit the State or prejudice the defendant's rights," *Proenza v. State*, 541 S.W.3d 786, 791 (Tex. Crim. App. 2017), by "impl[ying] approval of the State's argument, indicat[ing] disbelief in the defense's position, or diminish[ing] the credibility of the defense's approach to the case," *Simon v. State*, 203 S.W.3d 581, 590 (Tex. App.—Houston [14th Dist.] 2006, no pet.).

If the reviewing court finds a violation, that error must be reviewed under "the non-constitutional standard for reversible error in criminal cases." *Proenza*, 541 S.W.3d at 801 (discussing TEX. R. APP. P. 44.2(b)). Under Rule 44.2(b), any "error, defect, irregularity, or variance that does not affect substantial rights must be disregarded." TEX. R. APP. P. 44.2(b); *Barshaw v. State*, 342 S.W.3d 91, 93 (Tex. Crim. App. 2011).

"A substantial right is affected when the error had a substantial and injurious effect or influence in determining the jury's verdict." *Ellis v. State*, 517 S.W.3d 922, 931 (Tex. App.—Fort Worth 2017, no pet.). Stated differently,

> This court will not overturn a criminal conviction for non-constitutional error if the appellate court, after examining the record as a whole, has fair assurance that the error did not influence the jury, or influenced the jury only slightly. In considering the potential to harm, the focus is not on whether the outcome of the trial was proper

despite the error, but whether the error had a substantial or injurious effect or influence on the jury's verdict. A conviction must be reversed for non-constitutional error if the reviewing court has grave doubt that the result of the trial was free from the substantial effect of the error. Grave doubt means that in the judge's mind, the matter is so evenly balanced that he feels himself in virtual equipoise as to the harmlessness of the error. In cases of grave doubt as to harmlessness the petitioner must win.

*Barshaw*, 342 S.W.3d at 93–94 (cleaned up).

Neither party has the burden to prove or disprove harm; instead, it is the responsibility of the reviewing court, once it concludes there was error, to determine whether the error affected the judgment. *Johnson v. State*, 43 S.W.3d 1, 5 (Tex. Crim. App. 2001).

We review the entire record to determine the effect on the judgment. *Barshaw*, 342 S.W.3d at 93. We also consider "the nature of the evidence supporting the verdict, the character of the alleged error and how it might be considered in connection with other evidence in the case, and may include whether the State emphasized the error and whether overwhelming evidence of guilt was present." *Schmutz v. State*, 440 S.W.3d 29, 39 (Tex. Crim. App. 2014); *Barshaw*, 342 S.W.3d at 94. "While the most significant concern must be the error and its effects, the presence of overwhelming evidence supporting the finding in question can be a factor in the evaluation of harmless error." *Wesbrook v. State*, 29 S.W.3d 103, 119 (Tex. Crim. App. 2000); *Simon*, 203 S.W.3d at 593.

## 2.1 *Judicial Remarks Do Not Violate Article 38.05*

In his second issue, Ruiz argues the trial court violated article 38.05 during voir dire by explaining the meaning of being a "fair and impartial" juror, without specifically mentioning fairness to the defendant.

Ruiz reasons the trial court's remarks were not a purposeful attempt to prejudice his rights, but it was "reasonably calculated that fairness could be directed at any party in the matter thus prejudicing [his] rights." We disagree.

A trial court has "broad discretion in the manner it chooses to conduct voir dire, both as to the topics that will be addressed, and the form and substance of the questions that will be employed to address them." *Jacobs v. State*, 560 S.W.3d 205, 210–11 (Tex. Crim. App. 2018); *Woodall v. State*, 350 S.W.3d 691, 695 (Tex. App.—Amarillo 2011, no pet.) ("[A] trial judge has inherent authority to question prospective jurors regarding their qualifications and ability to serve as fair and impartial jurors").

The broader context of the trial court's statement shows Defense counsel was attempting to screen potential jurors for partiality given the injury-to-child charges.[2] During Defense counsel's questioning, the trial court interjected, repeating and rewording the same sentiment regarding partiality. The trial court did not misstate the law, comment on the strength of the

---

[2]    **DEFENSE COUNSEL**: So what we want to do here is impanel fair and impartial jurors for this kind of case. . . .  Because everyone—one of the great rights of the United States of America is the right to be tried by a jury of your peers, a fair and impartial jury; right?

Okay. So we have a lot of people who responded, "I can't sit on a case involving an injury to a child." That already in itself means, "I cannot be fair and impartial." The people who raised their hands, would you agree that you cannot be fair and impartial on a case involving injury to a child?

(Answers in the affirmative.)

**DEFENSE COUNSEL**: Okay. Is there anyone who says—

**THE COURT**: Just one moment, Counsel. Let me pause you for a moment. Everyone, the question is whether or not if you were selected on a trial, would you be able to listen to the evidence and based your opinion, if you can come to a conclusion, on whether somebody's guilty or not guilty based upon what you hear. So for those who raised your hand who said that you have an issue with child cases, that's the question about fairness. Whether you can sit on a jury, listen to the evidence, and based your decision, if you're able to come to a decision, based upon what you hear in the courtroom. That's the question. So if there's anyone who cannot do that from the last people who raised your card, you may do so now. Raise your card.

**VENIREPERSON**: Did you say can or cannot?

**THE COURT**: Cannot.

**DEFENSE COUNSEL**: Okay. Jurors who are raising their card cannot be fair and impartial on a case involving an injury to child. I'm going [to] read the numbers again.

evidence or any legal theory advanced by the Defense, or otherwise prevent Ruiz from exercising his rights. We conclude the remarks did not violate Article 38.05. *See Proenza*, 541 S.W.3d at 791 (holding judicial remark violates Article 38.05 if it is "reasonably calculated to benefit the State or prejudice the defendant's rights").[3]

### 3. *Modification of Judgment*

Although Ruiz's complaints on appeal do not address any error in the judgment, the record reveals a clerical error that requires modification.

The reporter's record reflects the jury returned a verdict of guilty on all counts. Count 1 is a first-degree felony, count II is a second-degree felony, and counts III to VIII are third-degree felony offenses. The clerk's record, however, memorialized the jury's sentence incorrectly in counts III to VIII.

The judgment in each cause should accurately reflect the jury's verdict on guilt and on punishment. *See Hampton v. State*, No. 04-13-00262-CR, 2014 WL 2457239, at *1 (Tex. App.—San Antonio May 28, 2014, no pet.) (mem. op., not designated for publication) (the trial court has a *sua sponte* duty to enter a proper judgment comporting with the verdict and oral pronouncement of sentence); *Asberry v. State*, 813 S.W.2d 526, 529–30 (Tex. App.—Dallas 1991, pet. ref'd) (appellate court has the authority to modify incorrect judgments *sua sponte* when information necessary to do so is available).

Because an appellate court has the authority to modify a judgment to accurately reflect the record, we modify the judgment as follows. The judgment in counts III, IV, V, VI, VII, and VIII

---

[3] As previously discussed, the jury heard overwhelming evidence that Ruiz physically abused and tortured M.L., eventually leading to her death. Even if we agreed the trial court's remarks constituted error, we conclude the challenged remarks were harmless. *See Wesbrook*, 29 S.W.3d at 119; TEX. R. APP. P. 44.2(b).

is corrected to read "Injury to a Child–BI, third-degree felony, section 22.04(f)." Tex. Penal Code § 22.04(f).

## CONCLUSION

Having overruled Ruiz's issues on appeal, we affirm the trial court's judgment of conviction as modified. We modify the judgment to accurately reflect the statutory provision, level of offense, and sentence that was rendered by the jury and adopted by the court. We affirm the trial court's judgment as modified. Tex. R. App. P. 43.2(b).

Velia J. Meza, Justice

DO NOT PUBLISH